Michigan Supreme Court
Lansing, Michigan

# Syllabus

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v JOHNSON
## PEOPLE v SCOTT

Docket Nos. 154128 and 154130. Argued April 11, 2018 (Calendar No. 2). Decided July 23, 2018.

In Docket No. 154128, Justly E. Johnson was convicted following a bench trial in the Wayne Circuit Court, Prentis Edwards, J., of first-degree felony murder, MCL 750.316(1)(b), assault with intent to rob while armed, MCL 750.89, and carrying or possessing a firearm when committing or attempting to commit a felony, MCL 750.227b. In Docket No. 154130, Kendrick Scott was convicted following a jury trial in the Wayne Circuit Court, Prentis Edwards, J., of the same offenses as Johnson. On the evening of May 8, 1999, the victim, her husband, and the victim's three children, including Charmous Skinner Jr. (Skinner), who was 8 years old at the time, went to see a movie, "Life," at a drive-in theater. On the way home, the family stopped at a house on the east side of Detroit. The victim, who was driving, waited in the van with the children while her husband went inside. While inside, her husband heard a noise, which turned out to be gunfire, and he went to the front door just in time to see both the victim's van speeding away and a man fleeing on foot. The victim, who had been struck in the chest by a single gunshot, drove the van to a nearby gas station, where she stopped and collapsed out of the vehicle. She later died at the hospital. Two individuals who were in the same neighborhood at the time of the crime, Antonio Burnette and Raymond Jackson, implicated defendants in the shooting and testified at both trials. Both defendants were convicted, and both defendants appealed in the Court of Appeals. The Court of Appeals affirmed Johnson's convictions, and the same Court of Appeals panel vacated on double-jeopardy grounds Scott's conviction of assault with intent to rob while armed but otherwise affirmed his convictions and sentences. Defendants sought leave to appeal in the Supreme Court, and the Supreme Court denied both applications. Johnson subsequently filed three motions for relief from judgment. In his second motion for relief from judgement, Johnson presented, as a claim of newly discovered evidence, a recantation by Burnette and an affidavit signed by one of Jackson's relatives indicating that Jackson lied at the trials. The trial court denied the motion, and the Court of Appeals and the Supreme Court denied leave to appeal. In his fourth motion for relief from judgment, Johnson asserted as a claim of newly discovered evidence that Skinner could attest that neither defendant was the shooter. The trial court denied the motion without a hearing. Johnson appealed in the Court of Appeals, and the Court of Appeals denied relief in an unpublished order entered May 30, 2013 (Docket No. 311625). Scott also filed his first and only motion for relief from judgment, raising the same claim concerning Skinner along with the claims of newly discovered evidence that

Johnson had made in his previous motions for relief from judgment. The trial court also denied Scott's motion without a hearing. Scott sought leave to appeal in the Court of Appeals, and the Court of Appeals denied relief in an unpublished order entered November 5, 2013 (Docket No. 317915). Both defendants sought leave to appeal in the Supreme Court, and the Supreme Court remanded the cases to the Court of Appeals for consideration as on leave granted, directing the Court of Appeals to first remand the cases to the trial court for an evidentiary hearing. *People v Johnson*, 497 Mich 897 (2014); *People v Scott*, 497 Mich 897 (2014). The Court of Appeals consolidated the cases and remanded to the trial court, retaining jurisdiction. At the evidentiary hearing, Skinner testified that he remembered the shooter's face and that the shooter's facial characteristics did not match those of either defendant. Burnette also testified at the evidentiary hearing, recanting much of the testimony he had given at defendants' trials. Additionally, although Jackson had died in 2008, his cousin testified that Jackson told her that he had lied on the stand. The trial court, James A. Callahan, J., denied both defendants' motions for relief from judgment, concluding that there was no reasonable probability of a different result if Skinner testified on retrial. The trial judge stated that Skinner, then 8 years old, would have been asleep in the car and could not have witnessed the shooting or, alternatively, if Skinner had not been asleep, he would not have been capable of seeing anyone outside the vehicle in the dark. The trial judge also questioned Skinner's overall credibility because Skinner had previously been convicted of perjury in an unrelated matter. Finally, the trial judge stated that he found it difficult to believe that Skinner could remember what the assailant looked like when the judge himself had difficulty remembering what his deceased relatives looked like. With regard to Burnette's and Jackson's testimony, the trial court stated that the testimony had been consistent on four different occasions. Defendants moved for peremptory reversal, and the Court of Appeals, STEPHENS, P.J., and FORT HOOD, J. (WILDER, J., dissenting), denied the motion. The Court of Appeals, SAAD and O'BRIEN, JJ. (SERVITTO, J., concurring), then affirmed the trial court's ruling in an unpublished per curiam opinion, issued May 31, 2016 (Docket No. 311625). Although the Court of Appeals disagreed with the trial court's factual finding that Skinner had to have been asleep at the time of the shooting, the Court of Appeals nevertheless found that the trial court did not clearly err by finding Skinner's testimony unreliable. Furthermore, the Court of Appeals held that the recantations were not part of the Supreme Court's remand order and that the trial court had thus erred by considering these other claims. Even if the recantations could be considered, the Court of Appeals held that the trial court correctly determined that the recantations lacked any substantive weight. Defendants each sought leave to appeal in the Supreme Court, and the Supreme Court granted leave in both cases, ordering that the cases be argued together. *People v Johnson*, 501 Mich 914 (2017); *People v Scott*, 501 Mich 914 (2017).

In an opinion by Justice BERNSTEIN, joined by Chief Justice MARKMAN and Justices VIVIANO and CLEMENT, the Supreme Court *held*:

The newly discovered evidence of Skinner's testimony in conjunction with the other evidence that would be presented on retrial would make a different result probable and therefore entitled both defendants to new trials. Accordingly, the Court of Appeals judgment was reversed in part and the cases were remanded to the Wayne Circuit Court for new trials.

1. MCR 6.508(D)(3) provides that a court may not grant relief to a defendant if the motion alleges grounds for relief that could have been previously raised, unless the defendant demonstrates both good cause for failing to raise such grounds earlier as well as actual prejudice.

In this case, the claim of newly discovered evidence pertaining to Skinner's eyewitness account could not have been raised on appeal from defendants' convictions or in a prior motion for relief from judgment because defendants did not know that Skinner saw the shooting until 2011. Therefore, MCR 6.508(D)(3) did not bar the claims regarding Skinner's account.

2. In order for a new trial to be granted on the basis of newly discovered evidence, a defendant must show that (1) the evidence itself, not merely its materiality, was newly discovered, (2) the newly discovered evidence was not cumulative, (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial, and (4) the new evidence makes a different result probable on retrial. In this case, it was undisputed that defendants satisfied their burden under the first three factors; therefore, the issue was whether the newly discovered evidence in the form of Skinner's testimony would make a different result probable on retrial. To determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible. If the court determines that a reasonable juror could have found the newly discovered evidence to be credible, the court then considers the impact of that evidence in conjunction with the evidence that would be presented on retrial.

3. In determining whether newly discovered evidence is credible, the trial court should consider all relevant factors tending to either bolster or diminish the veracity of the witness's testimony. A trial court's function is limited when reviewing newly discovered evidence, as it is not the ultimate fact-finder; should a trial court grant a motion for relief from judgment, the case would be remanded for retrial, not dismissal. A trial court's credibility determination is concerned with whether a reasonable juror could find the testimony credible on retrial. If a witness's lack of credibility is such that no reasonable juror would consciously entertain a reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion for relief from judgment. However, if a witness is not patently incredible, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide were it the ultimate fact-finder. In this case, the trial court found that Skinner was not a credible witness. The trial court's finding that Skinner could not have witnessed the shooting because Skinner must have been asleep was not rooted in anything in the record, and therefore the trial court clearly erred by finding that Skinner had been asleep during the shooting. The trial court also clearly erred to the extent that the trial judge supported his finding that Skinner could not possibly remember the shooter's face on the basis of the judge's own ability to remember the faces of his deceased relatives. Because the focus is on whether a reasonable juror could credit Skinner's testimony, the trial judge's focus on his own personal gaps in memory was inappropriate. Moreover, the trial court failed to acknowledge the expert testimony of a psychologist, who testified that it would not be impossible for a child of Skinner's age to recall specific details from a traumatic event several years later. The trial court additionally found that Skinner was not credible because Skinner could not have seen the shooter; however, the trial court failed to consider whether a reasonable juror could have believed that, depending on the angle of approach, the darkness of the street, and the lighting conditions in the car, Skinner might have been able to make out defining characteristics of the shooter's face. Furthermore, although it was appropriate for the trial court to take into account Skinner's prior perjury conviction, that conviction was obtained under circumstances very different from the case at hand, and a reasonable juror could have credited the fact that Skinner lacked any motive to lie in this case. When considering Skinner's testimony

in its entirety, it was clear that his testimony was not wholly incredible and that a reasonable juror could find his testimony worthy of belief on retrial. Therefore, the trial court clearly erred when it concluded that Skinner's testimony was entirely incredible.

4. In examining whether newly discovered evidence makes a different result probable on retrial, the trial court must consider the evidence that was previously introduced at trial. The trial court must also consider the evidence that would be admitted at retrial. In this case, the trial court failed to properly assess the effect of the newly discovered evidence in conjunction with the evidence that was presented at the original trials. Skinner testified that neither defendant was the shooter, identifying physical characteristics of the shooter that were completely contrary to the physical characteristics of both defendants, and this testimony was only strengthened when considered in conjunction with the evidence presented at the previous trials. Additionally, the trial court judge who presided over the motions for relief from judgment was not the same judge who presided over the preliminary examination or the original trials and therefore was functionally in the same position as an appellate court where the credibility of witnesses at the preliminary examination and the original trials was concerned; accordingly, the trial court's determination that Burnette's trial testimony was credible did not need to be afforded any deference. Furthermore, the trial court's finding that Burnette's previous testimony was consistent and compelling was not supported by the record: the prosecutor had to repeatedly refresh Burnette's memory at both Johnson's trial and at the preliminary examination, there were significant inconsistencies between the testimonies Burnette gave at the two different trials, and Burnette was unable to give a coherent time line as to what happened on the night in question. Moreover, the trial court failed to note that Burnette's and Jackson's testimonies conflicted with one another and that both witnesses admitted to consuming copious amounts of alcohol and marijuana during the times that defendants purportedly made incriminating statements. Accordingly, the Court of Appeals erred by failing to examine the evidence presented at the original trials. When Skinner's testimony is considered in conjunction with the other evidence presented at the original trials, a different result is reasonably probable on retrial.

5. While consideration of Skinner's testimony alone would make a different result probable on retrial due to the weaknesses of the prosecutor's witnesses, the evidence that would be presented at retrial may be considered, which included Burnette's and Jackson's recantation testimony. Even though Johnson already raised the recantation evidence in a prior motion for relief from judgment, and therefore was barred from raising the recantations as an independent ground for relief, the court rules do not prohibit considering this evidence in the context of the claim that Skinner's testimony would make a different result probable on retrial. The Court of Appeals erred by holding that the recantation evidence was not part of the Supreme Court's remand order. In considering the weight of these recantations, the trial court was correct to approach the recantations with suspicion. However, given the inherent weakness of Burnette's prior testimony at the trials, his recantation should not be viewed with as much suspicion as is generally accorded, and without his testimony, there is scant other evidence to establish that defendants committed the crime. Also, while Jackson's trial testimony was not inherently as weak as Burnette's trial testimony, it was also not as material as Burnette's trial testimony. Therefore, the recantation testimony supported the conclusion that a different result is probable on retrial.

Court of Appeals judgment reversed in part; cases remanded to the trial court for new trials.

Justice ZAHRA, dissenting, would have held that the trial court did not clearly err by determining that Skinner's testimony was not credible. The trial court did not fail to properly assess the effect of the newly discovered evidence in conjunction with the evidence that was presented at the original trials. Contrary to the majority's assertion, Judge Callahan, who was the judge presiding over the postjudgment matters in defendants' cases, did not position himself as an appellate court where the credibility of witnesses at the preliminary examination and the original trials was concerned. The majority failed to give regard to the special opportunity the circuit court judge (Judge Edwards) and the district court judge had to assess and weigh the credibility of the witnesses who appeared before them. Judge Edwards found that the witnesses, particularly Burnette, were fearful and attempted to tailor their testimony to provide Johnson an alibi. Because of this, Judge Edwards rejected this equivocating and inconsistent aspect of the witnesses' testimony, and rightly so. Judge Callahan relied on four reasons to conclude that Skinner was not credible: (1) Skinner was only 8 years old at the time of the murder and his memory some 16 years later could not be certain; (2) it would have been incredibly difficult for Skinner to be inside a car at night and see someone outside the vehicle when the only illumination was from the vehicle's interior dome light, especially when considering that both the victim and the car door were between Skinner and the shooter; (3) Skinner had already been convicted for perjury; and (4) in any event, Skinner likely would have been asleep inside the car at the time of the murder. The first three of these four findings clearly called Skinner's credibility into question and were not clearly erroneous; accordingly, Justice ZAHRA would have held that Judge Callahan did not abuse his discretion by denying defendants a new trial. Additionally, even assuming that Skinner was credible, Skinner's testimony would not make a different result on retrial probable given the evidence that defendants made threats to Burnette and Jackson in connection with their testimony and that Judge Edwards found Burnette and Jackson to be credible. A comprehensive examination of the evidence presented at defendants' original proceedings demonstrated that Judge Edwards sifted through the testimony and discounted the arguably equivocal and inconsistent testimony, instead finding the circumstantial evidence against defendants to be persuasive. Accordingly, Justice ZAHRA would have held that the newly discovered evidence was not credible and that even assuming the evidence was credible, the evidence would not have made a difference on retrial.

Justice MCCORMACK did not participate because of her prior involvement in this case as counsel for a party.

Justice WILDER did not participate because he was on the Court of Appeals panel that decided defendants' motions for peremptory reversal.

©2018 State of Michigan

# OPINION

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

FILED  July 23, 2018

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                   No. 154128

JUSTLY ERNEST JOHNSON,

       Defendant-Appellant.

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                   No. 154130

KENDRICK SCOTT,

       Defendant-Appellant.

BEFORE THE ENTIRE BENCH (except MCCORMACK and WILDER, JJ.)

BERNSTEIN, J.

In these consolidated cases, we consider whether the trial court erred by declining to grant new trials following defendants' motions for relief from judgment. After weighing the evidence presented at the trials along with defendants' claims of newly discovered evidence, we hold that the evidence in the form of testimony given by Charmous Skinner Jr. (Skinner) would make a different result probable on retrial. Accordingly, we reverse the judgment of the Court of Appeals in part and remand these cases to the trial court for new trials.[1]

## I. FACTS AND PROCEDURAL HISTORY

These cases arise from the murder of Lisa Kindred. Between midnight and 1:00 a.m. on May 9, 1999, Lisa was shot and killed while in her vehicle with her three children—Decola (newborn), Shelby (2 years old), and Skinner (8 years old). Earlier in the evening, Lisa, her husband (William Kindred), and her three children had gone to see a movie, "Life," at a drive-in theater in Dearborn, Michigan. On their way home, William announced that he wanted to make a stop on the east side of Detroit to talk to his sister's boyfriend, Verlin Miller, about purchasing a motorcycle. Lisa, who was driving, parked their minivan across the street from Miller's home and waited in the van with the children while William went inside. At one point, Lisa went to the door of the house and asked William to come back to the van, but William told her that he would be out shortly, and Lisa returned to the van. Soon afterward, William heard a noise, which turned out to

---

[1] Our holding that defendants are entitled to new trials due to their newly discovered evidence claims makes it unnecessary to consider their ineffective assistance of counsel claims. Therefore, we vacate the Court of Appeals' analysis of those issues as moot.

be gunfire, and went to the front door just in time to see both Lisa's van speeding away and a man fleeing on foot. William chased after the fleeing individual but failed to catch him.

Having been struck by the gunfire, Lisa drove the van to a nearby gas station, stopped, and then collapsed out of the vehicle. She later died at the hospital. The medical examiner's report revealed that Lisa's death was caused by a single gunshot wound to the chest. The report also revealed that small wounds on her body were consistent with her having been shot through an intervening medium. The driver's window had been shattered, but nothing had been stolen from the van. The children were not harmed, and they were still in the vehicle when the police arrived at the scene. A .22 caliber spent casing was found in the street at the scene of the shooting.

Two individuals who were in the same neighborhood at the time of the crime, Antonio Burnette and Raymond Jackson, implicated defendants Justly Johnson and Kendrick Scott in the shooting.[2] All four individuals knew each other from the same neighborhood. Johnson and Scott were tried separately—Johnson by bench trial and Scott by jury trial. Judge Prentis Edwards presided over both trials. Burnette and Jackson testified at both trials.

---

[2] Burnette testified at Scott's trial that he was 14 years old when the shooting occurred and was 15 years old at the time of the trial. However, at the evidentiary hearing, Burnette testified that he was born in 1982, which would have made him 16 or 17 years old when the shooting occurred and 17 or 18 years old at the time of the trial. Jackson was 22 years old at the time of the preliminary examination. Johnson was 24 years old at the time of the shooting, and Scott was 20 years old.

## A. JOHNSON'S BENCH TRIAL

In both trials, Burnette was the prosecutor's key witness. However, it is difficult to construct a linear time line of events from the night of the shooting according to Burnette's testimony, given the many inconsistencies in his testimony. According to Burnette, he was initially with both defendants the evening before the shooting. Burnette testified that Scott had discussed "planning something" but that Johnson had not said anything. However, when the prosecutor pointed out that Burnette had previously testified at the preliminary examination that both defendants had discussed plans for that evening with him, Burnette agreed that such a conversation had occurred. Burnette also failed to recall whether defendants had mentioned planning to "hit[] a lick," which he explained meant robbing someone. The prosecutor refreshed Burnette's memory with his preliminary examination testimony, and Burnette then clarified that defendants had discussed hitting a lick.

Burnette then testified that his father picked him up at 10:30 p.m. Burnette claimed that he again met up with both defendants around 2:30 a.m., at which point Johnson told him that Scott had shot a lady because she owed Scott money. However, Burnette also testified that he and Johnson drove around with an individual named Mike at some point in the evening. It is unclear from Burnette's testimony whether this drive took place earlier in the evening, before Burnette's father picked him up and before the shooting, or whether it occurred after Burnette met up again with defendants at 2:30 a.m. Burnette testified that Mike drove Johnson and him around and that Mike eventually dropped them both off when their plans fell through. At one point during his testimony, Burnette stated that he was dropped off at the same gas station that Lisa drove to.

4

Burnette also testified that he saw an ambulance and police vehicles at the gas station, suggesting that this took place after the shooting. However, Burnette's testimony changed several times as to whether Johnson was with him when he saw the ambulance at the gas station. Burnette also testified that, alternatively, he was dropped off elsewhere in Detroit, that he did not return to the gas station, and that he did not see an ambulance there.

Burnette further testified that when he met up with both defendants at 2:30 a.m., all three of them were smoking and drinking. Burnette testified that he had consumed 32 bottles of Budweiser and a half pint of Hennessy the day of the shooting, in addition to smoking 10 marijuana cigars. Burnette claimed that, while he was in this state, Johnson told him that Scott had shot a woman because she owed Scott money. Burnette also testified that he had first learned that a woman had been shot when he went to purchase marijuana earlier that evening and saw an ambulance and police officers in the neighborhood. It is unclear from Burnette's testimony whether this was related to his purported sighting of an ambulance and police officers at the gas station, or whether this was a separate incident. In any case, Burnette later contradicted himself yet again by stating that defendants were the ones who first informed him that someone had been shot.

Burnette also testified unclearly about whether his knowledge of the victim's name came from defendants or the police. Burnette agreed that, in his police statement, he stated that the woman who owed Scott money was named "Lisa." However, when Burnette was asked whether he knew anyone by that name, he testified that he did not. When he was asked if the police had given him that name, Burnette said that they had.

Burnette claimed that he saw both defendants with guns that night, an AK-47 and a .22 caliber rifle, albeit only after his memory was refreshed. Burnette testified that he saw Johnson place a gun in a vehicle and that Scott, sometime around 7:00 or 8:00 a.m. the morning after the shooting, placed the other gun in a different vehicle. Burnette went to sleep in Scott's car, where the police later found him. Burnette was taken in for questioning, and he testified that the police told him that he would be charged with a homicide offense.

Turning to Jackson's testimony, Jackson stated that, in the early morning hours on the day of the shooting, he woke up in his grandmother's home after hearing a gunshot.[3] When Jackson eventually went outside to see what had happened, he saw a police car in front of the field next door to his grandmother's house. Jackson testified that when he looked down the street, he saw Scott standing on his girlfriend's porch and saw Scott hand his girlfriend something long and covered in clothing. Jackson testified that he believed this object to be a dog leash. Shortly thereafter, the police took Jackson and Scott downtown for questioning, and Jackson said that he eventually returned home while the police kept Scott at the station. A police officer confirmed that Scott was still in custody when the officer reported to work between 8:00 and 8:30 a.m. that morning.

Sometime after Jackson returned to his grandmother's house, Johnson came over. Jackson alleged that Johnson was drunk when they spoke. But Jackson admitted that he, too, had consumed marijuana and three 40-ounce bottles of beer. It is unclear when, and in what time frame, Jackson consumed these substances. Jackson also acknowledged that

---

[3] Jackson's grandmother's house is across the street from Verlin Miller's home.

he sometimes saw and heard things that were not there, that he was recently released from the hospital after being admitted for mental health issues, and that he was taking prescription medications for his mental health conditions when the shooting occurred. In contrast to Burnette's testimony, Jackson testified that Johnson, not Scott, had admitted to "hit[ting] a lick" and that Johnson "messed up and had to shoot." However, Jackson clarified that the phrase "hit a lick" could mean a variety of things, only one of which was to rob someone.[4] Johnson also told Jackson that this occurred in the field next to Jackson's grandmother's home and that Scott was with him. Later, police arrived at Jackson's home and arrested Johnson. Sometime after Johnson's arrest, Jackson was held again at the police station. Jackson claimed that, while he was in custody, Johnson verbally threatened him for what he had told the police.

Like Burnette, Jackson's testimony also suffered from some inconsistencies, most notably whether Jackson was threatened by the police. On cross-examination, Jackson testified that the police had not threatened him. However, Jackson later testified that the second time he was at the police station, the police scared him, and he felt that if he did not come forward with "the truth," the police would try to pin the murder on him.

Johnson testified on his own behalf, denying any involvement in the shooting. Johnson testified that he met up with Scott and Burnette at Scott's home at around 9:30 p.m. the evening before the shooting. Johnson testified that he and Burnette were then continuously together that evening. Johnson did not testify as to the first purported conversation between him, Scott, and Burnette. Johnson testified that he later drove

---

[4] Jackson's brother testified that he was upset with Jackson for testifying against Johnson because Jackson had told his brother that Johnson hit a lick playing dice.

around with Mike and Burnette and that Johnson and Burnette were ultimately dropped off at the gas station at around 1:00 or 1:15 a.m., where Johnson saw several police cars gathered. From there, Burnette and Johnson returned to Scott's home, and Johnson told Scott that he had seen the police at the gas station. Johnson's girlfriend then picked him up around 2:30 a.m. Johnson confirmed that the next day he went over to Jackson's house, but Johnson denied speaking to Jackson about hitting a lick.

Judge Edwards found Johnson guilty of first-degree felony murder, MCL 750.316(1)(b), assault with intent to rob while armed, MCL 750.89, and carrying or possessing a firearm when committing or attempting to commit a felony (felony-firearm), MCL 750.227b. Johnson was sentenced to life imprisonment without parole for the first-degree murder conviction, 20 to 30 years' imprisonment for assault with intent to rob while armed, and a consecutive two-year sentence for the felony-firearm conviction.

## B. SCOTT'S JURY TRIAL

At Scott's trial, Burnette's testimony was more internally consistent but differed in large portions from his testimony at Johnson's bench trial. Burnette again testified that on the night of the shooting, he was with both defendants at Scott's house when defendants mentioned that they were going to hit a lick. Burnette then testified that his father picked him up at 10:30 p.m. and that they were together until around 2:00 a.m., at which point Burnette went back to Scott's house and met up with both defendants. Notably missing from Burnette's testimony was any indication that he had spent time that night driving around with Johnson and Mike. Burnette also did not mention having seen any ambulances or police cars in the neighborhood.

8

As before, Burnette testified that, at Scott's house, all three of the men were drinking and smoking marijuana and that he had personally consumed 32 bottles of Budweiser and a half pint of Hennessy, in addition to smoking 10 marijuana cigars. Burnette testified that Scott told him that "they had shot a lady" because she would not give them any money, while Johnson told him that only Scott "had shot the lady." This time, Burnette claimed he distinctly remembered that this was the first time he learned a lady had been shot, not when he saw police at the gas station. Burnette testified that both defendants told him that the shooting happened at the gas station. Burnette also testified that Scott was the one who told him that the woman's name was "Lisa" and that Johnson told him that Johnson and Scott had an "AK and a rifle." According to Burnette, his conversation with Johnson and Scott lasted until 3:00 a.m. or 4:30 a.m., at which point Johnson left when his girlfriend arrived to pick him up.

Consistent with his prior testimony, Burnette claimed that he went to sleep in Scott's car, where he was later awakened by the police. Burnette then gave conflicting testimony regarding whether the police threatened to charge him in connection with Lisa's murder. He first claimed that the police did not threaten him but then admitted that he had previously testified that the police indicated they were going to charge him if he did not state that defendants had killed Lisa. Burnette also testified that people in the neighborhood had threatened him for speaking to the police and testifying.[5]

Jackson testified consistently with his testimony at Johnson's trial that he heard a gunshot, went outside to see a police vehicle, saw Scott, and was questioned by the police

---

[5] This information had not been presented at Johnson's trial.

9

that evening along with Scott. Jackson further explained that when the police questioned him and Scott after the shooting, Scott told the police that he saw two men walking through his girlfriend's yard and that both men had rifles. Jackson said the police then took him and Scott downtown for further questioning at around 1:15 a.m. Jackson then returned to his grandmother's home, and he was unaware if Scott was also released from custody. Johnson visited the following morning. Jackson testified that he had started drinking before Johnson came over, but Jackson did not mention how much he drank and did not mention that he had ingested any other substances, like prescription medicine or marijuana. Jackson's testimony as to what Johnson said was consistent with his testimony at Johnson's trial. Jackson stated that he went to the police station the following day because the police had told him that he was "hiding something."

Scott did not testify or call any witnesses. A .22 caliber rifle was found at Scott's girlfriend's home, but the parties stipulated that the rifle was inoperable. A jury convicted Scott of the same offenses for which Johnson had been convicted, and Judge Edwards imposed the same sentences.

## C. DIRECT APPEALS AND MOTIONS FOR RELIEF FROM JUDGMENT

Both defendants appealed by right. The Court of Appeals affirmed Johnson's convictions. *People v Johnson*, unpublished per curiam opinion of the Court of Appeals, issued March 26, 2002 (Docket No. 228547). The same Court of Appeals panel vacated on double-jeopardy grounds Scott's conviction of assault with intent to rob while armed but otherwise affirmed his convictions and sentences. *People v Scott*, unpublished per curiam opinion of the Court of Appeals, issued March 26, 2002 (Docket No. 228548).

10

This Court denied both defendants' applications for leave to appeal. *People v Johnson*, 467 Mich 911 (2002); *People v Scott*, 467 Mich 911 (2002).

Johnson thereafter filed three motions for relief from judgment. In his second motion for relief from judgment, Johnson presented, as a claim of newly discovered evidence, Burnette's recantation and an affidavit from Jackson's relative that Jackson lied at the trials. The trial court denied the motion, and the Court of Appeals and this Court denied leave to appeal. *People v Johnson*, unpublished order of the Court of Appeals, entered February 11, 2009 (Docket No. 287529); *People v Johnson*, 485 Mich 893 (2009). Johnson's third motion for relief from judgment presented additional newly discovered evidence, which included police reports regarding domestic violence disputes between William and Lisa. Again, the trial court denied the motion, and the Court of Appeals and this Court denied leave to appeal. *People v Johnson*, unpublished order of the Court of Appeals, entered December 2, 2010 (Docket No. 298189); *People v Johnson*, 489 Mich 990 (2011).

Johnson filed his current and fourth motion for relief from judgment in December 2011. In particular, Johnson claimed that there was newly discovered evidence that one of the victim's children, Skinner, could attest that neither defendant was the shooter. The trial court denied the motion without a hearing, and the Court of Appeals denied relief. *People v Johnson*, unpublished order of the Court of Appeals, entered May 30, 2013 (Docket No. 311625).

Scott filed his first and only motion for relief from judgment in March 2013. Scott raised the same newly discovered evidence claim concerning Skinner, along with the claims of newly discovered evidence that Johnson had made in his previous motions for

11

relief from judgment. The trial court[6] denied the motion without a hearing, and the Court of Appeals denied leave to appeal. *People v Scott*, unpublished order of the Court of Appeals, entered November 5, 2013 (Docket No. 317915).

Both defendants filed applications for leave to appeal in this Court. This Court remanded the cases to the Court of Appeals for consideration as on leave granted, directing the Court of Appeals to first remand these cases to the trial court for an evidentiary hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), to determine whether defendants were deprived of their right to the effective assistance of counsel and whether defendants were entitled to new trials based on newly discovered evidence. *People v Johnson*, 497 Mich 897 (2014); *People v Scott*, 497 Mich 897 (2014).

## D. EVIDENTIARY HEARING

After consolidating the cases, the Court of Appeals remanded the case to the trial court for an evidentiary hearing. At the evidentiary hearing, Skinner testified that he was eight years old at the time his mother was killed. Skinner testified that on the evening in question, he and his family went to a drive-in movie theater, specifically recalling that they saw the movie "Life." When they stopped at Miller's house after the movie, Skinner testified that William went in by himself, while everyone else waited in the car. Skinner was originally sitting in the back seat of the van, but he had moved up to the front passenger seat as they waited for William to return. Skinner remembered that Lisa

---

[6] Judge Edwards has since retired, and his successor, Judge James Callahan, presided over Scott's proceeding for motion for relief from judgment and the evidentiary hearing that followed.

12

appeared agitated and that she left the van at one point to briefly speak with William. When she returned to the van and opened the door to get back in, Skinner saw a man behind her. Skinner recalled that the man was African-American and in his mid-thirties, with very short hair, a beard, and a big nose.[7] Skinner testified that the man's face was visible, even though it was dark out, because the dome light of the van had turned on when Lisa opened the door. Skinner stated that the man was standing behind Lisa and off to the side, and he was able to see the man for "[a]bout 25 seconds." When the man was about 6 inches behind her, with the door between him and Lisa, Skinner heard a gunshot, and the driver's-side window shattered. Lisa got into the car and raced to the nearest gas station, where she later collapsed.

After his mother's death, Skinner never talked to William or the rest of his family about what he saw that night. He was not interviewed by any police officers, but he testified that if an officer had asked him about what he witnessed that night, he would have told the truth and would have been able to identify the shooter. Some time after the shooting, Skinner moved to Pennsylvania to live with his biological father's family. His family attempted to speak to him about his mother's death, but Skinner refused. He recalled seeing a counselor to talk about his mother, but he did not tell the counselor about what he saw that night.

In 2007, the Wisconsin Innocence Project contacted Skinner by telephone, and Skinner indicated that he saw what had happened to his mother. Skinner did not give the

_____

[7] Both defendants were in their twenties at the time of the shooting. The trial court also noted that Skinner's description of the shooter was "completely contrary to the physical characteristics of both defendants in this case."

13

Wisconsin Innocence Project a description of the shooter, and the Wisconsin Innocence Project never followed up with Skinner. In 2011, Skinner was contacted by an investigative reporter, who wrote a letter inquiring about his mother's death. Skinner testified that when he received the letter, he was surprised to learn that they were still trying to find out who had killed his mother. Based on this letter and the news articles he read, Skinner got the impression that defendants were wrongly convicted, so he spoke to the reporter, revealing for the first time his account of the shooting and giving the reporter a description of the shooter, noting that he "will never forget the person's face." The Michigan Innocence Clinic subsequently showed Skinner a photo lineup that included pictures of both defendants from the time of the incident, and he was confident that the person who shot his mother was not in the lineup.

At the evidentiary hearing, Skinner acknowledged that he had been previously convicted of perjury for falsely testifying in a case in which his friend was charged in connection with a double homicide. But Skinner testified that he would not lie to protect someone he did not know and that he would tell the truth in order to find his mother's killer.

Dr. Katherine Rosenblum, who was qualified as an expert in clinical and developmental psychology, also testified at the evidentiary hearing. Rosenblum testified that an eight-year-old child who witnessed a traumatic event would certainly be mature enough to have clear memories of the event. Rosenblum noted that research suggests a "narrowing of attention" in moments of high traumatic stress that leads people to "focus on and remember very clearly particular details . . . to the exclusion of some other, more peripheral details."

14

Burnette also testified at the evidentiary hearing, recanting much of what he had testified to at defendants' trials. Burnette asserted that neither defendant confessed to robbing or shooting a woman. Burnette also testified that he did not see either defendant with a gun on the day in question and that he was with Johnson at a relative's home at the time of the shooting. Burnette took back his previous testimony that the police had not threatened him, indicating that he had been afraid that he would be charged with the murder if he did not implicate someone. Burnette also stated that he was not coerced by either defendant or their families into giving his recantation testimony. On cross-examination, the prosecutor cited Burnette's preliminary examination testimony, in which he had testified that he was afraid of defendants, but Burnette denied this, saying he was coached by the police to say he was scared.

Though Jackson had died in 2008, his cousin, Lameda Thomas, testified at the evidentiary hearing that Jackson had told her that he had lied on the stand out of fear of prosecution on two separate occasions. Specifically, Thomas testified that Jackson had stated he lied about Johnson telling him he hit a lick and had to shoot.

E. TRIAL COURT'S RULING

The trial court denied both defendants' motions for relief from judgment, concluding that there was no reasonable probability of a different result if Skinner testified on retrial.

Specifically, the trial court found Skinner's testimony to be incredible for several reasons. First, the trial court concluded that Skinner could not have witnessed the shooting because Skinner would have been asleep based on the fact that he was on the

15

way back from seeing the movie, "Life," which was not "Fantasia here or a Mickey Mouse cartoon. . . . So we're talking about [a movie about] life imprisonment or whatever . . . [s]omething that a child would have nothing to relate to." Accordingly, the trial court concluded that the children, including Skinner, "undoubtedly . . . were asleep in the back of the van . . . ."

Second, even if Skinner had not been asleep, the trial court found that Skinner "wouldn't have been capable of seeing anybody outside," much less be able to pick out details regarding facial hair. The trial court reasoned that Lisa would have blocked Skinner's vision, as she stood between him and the shooter, and that the dome light would not have shed any light outside the car.

Third, the trial court questioned Skinner's overall credibility based on his perjury conviction, stating: "Should we believe him, seeing as how he was in prison for perjury? I mean good grief. Doesn't that go right to the essence of it?"

Lastly, the trial court noted that a significant amount of time had passed since the shooting had occurred. The trial court found it relevant that Skinner could not remember the name of his teacher or the school that he attended at the time. The trial court also found it hard to believe that Skinner would be able to remember what the shooter looked like:

> I bet [Skinner] couldn't remember what his mother looked like today. . . . I have difficulty remembering what my father looked like, and it wasn't that long ago or my wife for that matter, which wasn't that long ago. But yet, he remembers what this shooter looked like at the time? I find it almost impossible to believe.

16

With regard to Burnette and Jackson, the trial court stated that "[e]very one of the testimonies that were given during the course of the preliminary examination and the trial[s], and we're talking about four different occasions here, was the same by Mr. Burnett [sic] and by Mr. Jackson."[8]  The trial court also noted that both witnesses knew the type of weapon that was used for the killing and both witnesses identified the victim by name.  As to Burnette's testimony that he was coached by the police, the trial court found this illogical, reasoning that the police would not be able to predict what would be asked of Burnette.  The trial court finally concluded that it could not find "any reasonable probability that there would be a different result in this case, even if Mr. Skinner was allowed to give testimony in regard to this matter, nothing."[9]

## F.  COURT OF APPEALS' RULING

The Court of Appeals majority affirmed the trial court's ruling in an unpublished per curiam opinion.  *People v Johnson*, unpublished per curiam opinion of the Court of Appeals, issued May 31, 2016 (Docket No. 311625).  Although the Court of Appeals disagreed with the trial court's factual finding that Skinner had to have been asleep at the time of the shooting, the Court of Appeals nevertheless found that the trial court did not clearly err by finding Skinner's testimony unreliable.  Furthermore, the Court of Appeals

---

[8] The preliminary examination was jointly held for both defendants.  Thus, the trial court was incorrect to note that there were four occasions when the witnesses previously testified, as there were only three occasions: the joint preliminary examination, and then the separate trials.

[9] The trial court also concluded that the domestic violence records would not make a different result probable on retrial.

held that the recantations were not part of this Court's remand order and that the trial court had thus erred by considering these other claims. Even if the recantations could be considered, the Court of Appeals held that the trial court correctly determined that the recantations "seriously lacked any substantive weight." *Id*. at 10 n 8.[10]

Defendants each filed an application for leave to appeal in this Court. We granted leave in both, ordering that the cases be argued together. *People v Johnson*, 501 Mich 914 (2017); *People v Scott*, 501 Mich 914 (2017).

## II. STANDARD OF REVIEW

This Court reviews a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003). "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted). A mere difference in judicial opinion does not establish an abuse of discretion. *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 228; 600 NW2d 638 (1999).

A trial court's factual findings are reviewed for clear error. MCR 2.613(C). Clear error occurs if "the reviewing court is left with a definite and firm conviction that the trial

---

[10] The Court of Appeals also held that the trial court erred by considering the domestic violence records because it was outside the scope of this Court's remand order and, in any event, the records would be inadmissible hearsay. Because we conclude that Skinner's testimony, in conjunction with the evidence presented at the original trials, is sufficient to find a different result probable on retrial, it is unnecessary for us to consider whether the domestic violence records would be admissible and what their potential impact would be on retrial.

18

court made a mistake." *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014) (quotation marks and citations omitted). MCR 2.613(C) provides that "regard shall be given to the special opportunity of the trial court to judge the credibility of the *witnesses who appeared before it*." (Emphasis added.) And "appellate courts need not refrain from scrutinizing a trial court's factual findings, nor may appellate courts tacitly endorse obvious errors under the guise of deference." *People v McSwain*, 259 Mich App 654, 683; 676 NW2d 236 (2003) (quotation marks and citation omitted).

## III. ANALYSIS

Motions for relief from judgment are governed by MCR 6.500 *et seq*. MCR 6.508(D)(3) provides that a court may not grant relief to a defendant if the motion alleges grounds for relief that could have been previously raised, unless the defendant demonstrates both good cause for failing to raise such grounds earlier as well as actual prejudice. The newly discovered evidence claim pertaining to Skinner's eyewitness account could not have been raised on appeal from defendants' convictions or in a prior motion for relief from judgment because defendants did not know that Skinner saw the shooting until 2011. Therefore, MCR 6.508(D)(3) does not bar the newly discovered evidence claims regarding Skinner's account.

Although Scott's motion was his first motion for relief from judgment, Johnson's motion was a successive motion for relief from judgment, which is also governed by MCR 6.502(G). Generally speaking, "one and only one motion for relief from judgment may be filed with regard to a conviction. . . . A defendant may not appeal the denial or rejection of a successive motion." MCR 6.502(G)(1). However, a defendant may file a

19

successive motion based on "a claim of new evidence that was not discovered before the first such motion." MCR 6.502(G)(2). The prosecutor does not argue that defendants' claim of newly discovered evidence in the form of Skinner's testimony is procedurally barred, either under MCR 6.502(G) or MCR 6.508(D)(3)(a).

In their current motions for relief from judgment, defendants raise the claim of newly discovered evidence in the form of Skinner's testimony.[11] In order for a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *Cress*, 468 Mich at 692 (quotation marks and citation omitted). The Court of Appeals analyzed the first three *Cress* factors and concluded that defendants satisfied their burden under each factor. On appeal, the prosecutor does not contest the Court of Appeals' conclusions as to the first three factors of *Cress*. Thus, the central issue before this Court is the fourth prong of *Cress*, whether "the new evidence makes a different result probable on retrial." *Id*.

## A. CREDIBILITY

In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible. *Id*.

---

[11] Because this is Scott's first motion for relief from judgment, his claim of newly discovered evidence also includes the witness recantations and the domestic violence records.

at 692-693. In making this assessment, the trial court should consider all relevant factors tending to either bolster or diminish the veracity of the witness's testimony. See *id*. at 692-694. A trial court's function is limited when reviewing newly discovered evidence, as it is not the ultimate fact-finder; should a trial court grant a motion for relief from judgment, the case would be remanded for *retrial*, not dismissal. In other words, a trial court's credibility determination is concerned with whether a *reasonable juror* could find the testimony credible on retrial. See *Connelly v United States*, 271 F2d 333, 335 (CA 8, 1959) ("The trial court has the right to determine the credibility of newly discovered evidence for which a new trial is asked, and if the court is satisfied that, on a new trial, *such testimony would not be worthy of belief by the jury*, the motion should be denied.") (quotation marks and citation omitted; emphasis added).

Recently, in *People v Anderson*, 501 Mich 175; 912 NW2d 503 (2018), we compared the respective roles of a trial judge presiding over a motion for a new trial and a magistrate presiding over a preliminary examination when rendering credibility determinations. We held that, in the context of a preliminary examination, "[i]f a witness's lack of credibility, when considered together with the other evidence presented during the examination, is so lacking that 'a person of ordinary prudence and caution [would not] conscientiously entertain a reasonable belief of the accused's guilt,' a magistrate may not bind over the defendant for trial." *Id*. at 188-189 (citation omitted). See also *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1998) ("As the trier of fact, the jury is the final judge of credibility.") (quotation marks and citation omitted); *Yaner v People*, 34 Mich 286, 289 (1876) ("We do not desire to be understood that the magistrate must nicely weigh evidence as a petit jury would, or that he must discharge the

21

accused where there is a conflict of evidence, or where there is a reasonable doubt as to his guilt; *all such questions should be left for the jury upon the trial*.") (emphasis added). Although *Anderson* does not control in this context, as we are not now dealing with a preliminary examination, a trial court similarly plays a preliminary gatekeeping role in assessing a defendant's motion for relief from judgment; in both situations, the trial court is contemplating a future trial and the role of a future fact-finder.[12] If a witness's lack of credibility is such that *no* reasonable juror would consciously entertain a reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion for relief from judgment. However, if a witness is not patently incredible, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide, were it the ultimate fact-finder.

In this case, the trial court found that Skinner was not a credible witness. Importantly, the trial court noted that Skinner could not have witnessed the shooting, because the trial court found that Skinner must have been asleep. If Skinner was asleep for the shooting, then there could be no value to Skinner's testimony. As this was a factual determination, we review it for clear error, which exists if "the reviewing court is left with a definite and firm conviction that the trial court made a mistake." See *Douglas*, 496 Mich at 592 (quotation marks and citation omitted). We, like the Court of Appeals, conclude that the trial court clearly erred by finding that Skinner was asleep during the

---

[12] This Court noted in *Anderson* that there is some justification for "providing a magistrate with greater authority to examine credibility during a preliminary examination than a judge has in entertaining a motion for a new trial." *Anderson*, 501 Mich at 187 n 4.

shooting. Nothing in the record suggested that Skinner had been asleep beyond the trial court's mere speculation that the movie "Life" would certainly put a child to sleep. Even if the trial court were right to assume that Skinner was asleep during the movie, there is nothing to suggest that Skinner could not have woken up afterwards. In fact, Skinner specifically testified that, once William went into the house, he climbed into the front passenger's seat with his mother, indicating that he was awake and did witness the events. Because the trial court's factual finding was not rooted in anything in the record, the trial court clearly erred by finding that Skinner was asleep during the shooting.[13]

The trial court also found that Skinner's testimony was not credible even if he had been awake. The trial court particularly questioned Skinner's ability to remember the shooter's face, noting that Skinner could not possibly remember what his own mother looked like, given that the trial judge had difficulty remembering his own father's face or his wife's face, despite them passing more recently than Lisa. To the extent the trial judge supported his credibility determination on the strength of his own memory, the trial court clearly erred. Because the focus is on whether a *reasonable juror* could credit Skinner's testimony, the trial judge's focus on his own personal gaps in memory was inappropriate. Whether or not a judge has a particularly good or bad memory has no legal relevance to whether a reasonable juror would find that a witness has the ability to recall something, especially when an expert witness has testified in support of that ability. In fact, the trial court failed to acknowledge Rosenblum's expert testimony, which

_____

[13] The prosecutor conceded that the trial court's finding that Skinner was actually asleep at the time of the murder was clearly erroneous because it was speculative and unsupported by the record.

indicated that it would not be impossible for a child of Skinner's age to recall specific details from a traumatic event several years later.

The trial court additionally found that Skinner was not credible because Skinner could not have seen the shooter due to the position of Lisa's body. The trial court also considered the effect of Skinner's prior perjury conviction on his credibility. See MRE 609. Although it is appropriate for a trial court to take into account such weaknesses in a witness's testimony, the trial court failed to determine whether a reasonable juror might conclude that Skinner is nonetheless credible with regard to the facts at issue here. The trial court failed to consider whether a reasonable juror could have believed that, depending on the angle of approach, the darkness of the street, and the lighting conditions in the car, Skinner might have been able to make out defining characteristics of the shooter's face. A reasonable juror also could have credited the fact that Skinner lacked any motive to lie in this case. Although Skinner had a prior conviction for perjury, that conviction was obtained under circumstances very different from the case at hand.

Indeed, Skinner's testimony corroborated several specific details that took place on the night of the shooting, such as the specific film his family had watched that night, that Lisa had been driving the van, that William had visited a relative's home while Lisa and the others waited in the van, that Lisa momentarily left the car to speak with William, and that the gunshot broke the driver's window. While Skinner's testimony contained some questionable aspects, which the trial court appropriately noted, it also contained some reliable aspects, which the trial court failed to acknowledge. When considering Skinner's testimony in its entirety, it is clear that his testimony is not wholly incredible, as the trial court found, and that a reasonable juror could find his testimony worthy of

24

belief on retrial. Therefore, the trial court clearly erred when it concluded that Skinner's testimony was entirely incredible.

## B. RESULT ON RETRIAL

Because a reasonable juror could have found Skinner's testimony to be credible, we now consider the impact of that testimony in conjunction with the evidence that would be presented on retrial. In examining whether this "new evidence makes a different result probable on retrial," the trial court must consider the evidence that was previously introduced at trial. *Cress*, 468 Mich at 692; see also *People v Grissom*, 492 Mich 296, 321; 821 NW2d 50 (2012) (ordering "the trial court [on remand to] carefully consider the newly discovered evidence *in light of the evidence presented at trial*") (emphasis added). The trial court must also consider the evidence that would be admitted at *retrial*, which in this case includes the recantation testimony. *Cress* specifically uses the term "retrial," which refers to a *new* trial. Thus, the evidence that must be taken into consideration when assessing a claim of newly discovered evidence is not simply the evidence presented at the original trial, but also the evidence that would be presented at a new trial. *Cress*, 468 Mich at 694 ("[The confessor's] testimony (even presuming he would testify at a *new trial*) would not make a different result probable on retrial.") (emphasis added). Accordingly, the Court of Appeals erred by failing to examine the evidence presented at the original trials and holding that the recantations were beyond the scope of this Court's remand order.

In this case, we find that the trial court failed to properly assess the effect of the newly discovered evidence in conjunction with the evidence that was presented at the

original trials. Notably, Skinner testified that neither defendant was the shooter. Skinner described the shooter as being in his mid-thirties, and neither defendant was in his thirties at the time of the shooting. Additionally, Skinner stated that the shooter had a large nose and a beard, which the trial court noted was "completely contrary to the physical characteristics of both defendants in this case." Although the trial court had reason to question some aspects of Skinner's testimony, Skinner's testimony is only strengthened when considered in conjunction with the evidence presented at the previous trials.

Burnette was the prosecutor's key witness, as he was the only witness who testified that defendants admitted to shooting Lisa, and he was the only witness who testified that he saw defendants with weapons. In considering the value of Burnette's trial testimony, the trial court found "[e]very one of the testimonies that were given during the course of the preliminary examination and the trial[s], and we're talking about four different occasions here, was the same by Mr. Burnett [sic] . . . ." However, the trial court judge who presided over these motions for relief from judgment was not the same judge who presided over the preliminary examination or the original trials. The trial court judge thus was functionally in the same position as an appellate court where the credibility of witnesses at the preliminary examination and the original trials was concerned. Accordingly, the trial court's determination that Burnette's trial testimony was credible need not be afforded any deference by this Court. See MCR 2.613(C) ("[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the *witnesses who appeared before it*.") (emphasis added).

The trial court's finding that Burnette's previous testimony was consistent and compelling is also not supported by the record. To begin with, the prosecutor had to

repeatedly refresh Burnette's memory at Johnson's trial with his prior police statement and his testimony at the preliminary examination when Burnette did not initially testify in favor of the prosecutor's position.[14] Burnette was also unable to give a coherent time line as to what happened on the night in question; in reviewing the record, it remains unclear when and if Burnette and Johnson went on a ride with Mike, as multiple different possibilities were suggested at Johnson's trial, yet no mention of this was made at Scott's trial.[15] Burnette's discussion of his ride with Mike alone is confusing and internally inconsistent, as Burnette alternatively testified that Mike dropped both him and Johnson off at the gas station, that Mike dropped him and Johnson off somewhere else entirely, and that Burnette never returned to the gas station.

---

[14] For example, when Burnette was asked whether Johnson talked about hitting a lick, Burnette said, "No." And when asked, "Did you tell the court that [Johnson] talked about hitting a lick?", Burnette responded, "I can't recall." The prosecutor then pointed out that Burnette had previously testified at the preliminary examination that Johnson spoke about hitting a lick, and Burnette agreed that this was true. In addition, when asked if Johnson had told Burnette anything, Burnette said, "Not that I can recall." Then, when Burnette was asked, "Did you ever tell the police what [Johnson] said to you at [Scott's] house?", Burnette again said, "I can't recall." Burnette was then asked to refresh his memory with his police statement, and after this, Burnette admitted that he told the police that Johnson said that Scott shot the lady. Furthermore, when asked if he saw either of the defendants with a gun that night, Burnette said, "Not if I can remember." Burnette once again had to have his memory refreshed with his preliminary examination testimony, and once he did, he remembered that he saw defendants with guns.

[15] Although this information would arguably be more relevant at Johnson's trial than at Scott's trial, Burnette did testify at Johnson's trial that he was dropped off at the same gas station that Lisa drove to, where he saw an ambulance and police officers and first learned of this shooting. Were this true, this would clearly be relevant at Scott's trial, but it goes unmentioned.

27

There were also significant inconsistencies between the testimonies Burnette gave at the two different trials. At Johnson's trial, Burnette initially testified that he first learned that there had been a shooting due to the police presence in the neighborhood, but he later suggested that the defendants were the ones who first told him about the shooting. Burnette also did not clarify whether he learned the victim's name from the police or the defendants. Furthermore, Burnette could not recall if only one defendant or both had mentioned "hitting a lick," whether Johnson had confessed that Scott had shot Lisa, and whether he had seen any weapons. At Scott's trial, Burnette instead testified that defendants were the ones who first told him about the shooting, that defendants were the ones who told him the victim's name, and that he saw defendants with guns. Clearly, Burnette's testimonies across both trials were *not* the same, contrary to the trial court's finding, and there is no larger consistent narrative to rely on in trying to uphold Burnette's prior trial testimonies as credible.

Moreover, the trial court failed to note that Burnette's and Jackson's testimonies also conflicted with one another; in order to find one credible, the other would have to be found not credible. Burnette testified that defendants told him around 2:30 a.m. that they shot someone and that he later saw Scott place his gun in a vehicle at 7:00 or 8:00 a.m. However, Jackson testified that he and Scott were taken into custody shortly after the shooting at approximately 1:15 a.m., and an officer confirmed that Scott remained at the police station until at least 8:00 or 8:30 a.m. Additionally, Jackson claimed that he and Scott were in police custody at a time when Burnette claimed he spoke with Scott outside of custody. It is thus impossible to fully credit both accounts, as they are incompatible

28

and cannot be reconciled. This is particularly significant because these early morning hours are when Burnette testified that defendants admitted to shooting someone.

While Jackson's testimony is not as questionable as Burnette's testimony, Jackson's testimony alone provides scant evidence that defendants committed the crime. Jackson testified that he witnessed Scott hand over an object to Scott's girlfriend after the shooting and that Johnson told him that he had hit a lick and had to shoot. However, he also testified that he believed the object to be a dog leash and that "hitting a lick" could refer to something that happens in a game of dice.

Burnette's and Jackson's testimonies were also inconsistent as to whether the police threatened them. At Scott's trial, Burnette testified that the police did not tell him that they believed he was involved in the shooting, but Burnette later agreed that the police told him he would be implicated in the murder if he did not state who did it. At Johnson's trial, Jackson initially testified that the police did not threaten him but later claimed that the police scared him. Jackson stated that he also felt pressured to confess or else he would have been implicated in the crime.

More inconsistencies abound: although the trial court stated that both witnesses identified that a .22 caliber rifle was used, the record shows that only Burnette testified to this, as Jackson never identified the object Scott handled as a gun. Moreover, while Burnette testified that Johnson told him that *Scott* had shot someone, Jackson testified that *Johnson* was the one who admitted being the shooter.

Finally, the trial court also failed to take into account that both witnesses admitted to consuming copious amounts of alcohol and marijuana during the times that defendants purportedly made incriminating statements, which severely undermines the reliability of

29

their assertions. Jackson even admitted to hearing and seeing things that did not exist, which further weighs against his credibility.

An examination of the trial testimony alone indicates that defendants' convictions were based on shaky grounds.[16] Consequently, when Skinner's testimony is considered in conjunction with the other evidence presented at the original trials, we find that a different result is reasonably probable on retrial. See *People v Tyner*, 497 Mich 1001, 1001-1002 (2015).

While consideration of Skinner's testimony alone would make a different result probable on retrial due to the weaknesses of the prosecutor's witnesses, this Court may also consider the evidence that would be presented at *retrial*, which in this case includes the recantation testimony.[17] On retrial, we assume that Burnette would be called to

---

[16] "[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v Agurs*, 427 US 97, 113; 96 S Ct 2392; 49 L Ed 2d 342 (1976). Similarly, in an ineffective assistance of counsel claim, when there is little evidence to support a conviction, then "the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt." *People v Trakhtenberg*, 493 Mich 38, 56; 826 NW2d 136 (2012) (quotation marks and citation omitted). While *Agurs* involved whether the defendant was deprived of a fair trial under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), and *Trakhtenberg* involved whether the defendant was deprived of his right to the effective assistance of counsel under *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), both are instructive because *Brady* and *Strickland* require an assessment as to whether the new evidence or ineffective assistance calls into question the validity of a prior conviction. *Brady*, 373 US at 87; *Strickland v Washington*, 466 US at 694.

[17] While Johnson already raised the recantation evidence in a prior motion for relief from judgment, the recantations may nonetheless be taken into consideration, as conceded by the prosecutor. Though Johnson is barred from raising the recantations as an *independent* ground for relief, the court rules do not prohibit considering this evidence *in the context of* the claim Johnson is now raising. This is not in contravention of MCR 6.508(D)(2), as

---

testify consistently with his recantation that he was with Johnson the night that Lisa was shot and that neither defendant said anything in regards to the shooting. Additionally, if the prosecutor chose to admit Jackson's testimony from the original trials implicating defendants on retrial, defendants would be able to impeach that testimony with his cousin's testimony that he committed perjury. MRE 804(b)(3); MRE 806.[18]

In considering the weight of these recantations, the trial court was correct to approach the recantations with suspicion. See *People v Barbara*, 400 Mich 352, 362-363; 255 NW2d 171 (1977) ("Where such [newly discovered] evidence, however, takes the form of witnesses' recantation testimony, it has been traditionally regarded as suspect and untrustworthy."); *People v Van Den Dreissche*, 233 Mich 38, 46; 206 NW 339 (1925) ("[R]ecanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true.") (quotation marks

---

the particular ground for relief that Johnson now raises, which concerns Skinner's testimony, has never been decided against Johnson in a prior proceeding. This is further supported by *Cress*, which requires a determination of whether "the new evidence makes a different result probable on *retrial*." *Cress*, 468 Mich at 692 (emphasis added).

[18] The prosecutor argues that Jackson's recantation would be inadmissible pursuant to MRE 804(b)(3): "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." However, the recantation would be admissible because defendant has the right, per MRE 806, to attack the credibility of Jackson's former testimony. MRE 806 ("When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness."); see also *Blackston v Rapelje*, 780 F3d 340, 352-353 (CA 6, 2015) (holding that a refusal to allow a defendant to impeach unavailable witnesses' prior testimony with the witnesses' later recantations violated the Sixth Amendment right to confrontation of witnesses).

and citation omitted). However, given the inherent weakness of Burnette's prior testimony at the trials, his recantation should not be viewed with as much suspicion as generally accorded. In fact, unlike *Van Den Dreissche*, in which there was no evidence to support the witness's recantation, here, Burnette's recantation *was* supported by the record. See *Van Den Dreissche*, 233 Mich at 41.

Again, Burnette's previous testimony was incoherent at several points, and, notably, Burnette likely did not speak to or see Scott after the shooting because Scott was already in police custody at that point. This provides support that Burnette's previous testimony was not credible and that his recantation is *more* credible. See *Barbara*, 400 Mich at 363-364; *Grissom*, 492 Mich at 350 (ZAHRA, J., concurring in part and dissenting in part) ("[N]ewly discovered evidence to impeach a witness could potentially make a different result probable on retrial if it directly contradicts material testimony by that witness at trial in a manner that tends to exculpate the defendant."). Without Burnette's testimony, there is scant other evidence to establish that defendants committed the crime. Thus, Burnette's recantation further supports our conclusion that a different result is probable on retrial.

While Jackson's trial testimony was not inherently as weak as Burnette's trial testimony, it was also not as material as Burnette's trial testimony. Even if Jackson's recantation is not presented, considering Jackson's previous testimony in light of the other evidence that would be presented at retrial, we believe that defendants have a reasonably likely chance of acquittal.

Therefore, we conclude that Skinner's testimony would make a different result probable on retrial.

32

## IV.  CONCLUSION

For the aforementioned reasons, we hold that the newly discovered evidence of Skinner's testimony entitles both defendants to new trials.  In balancing the evidence presented at the trials along with Skinner's testimony, the only principled outcome that can be reached is that Skinner's testimony would make a different result probable on retrial.  This is further supported when considering the impact of the recantations on Burnette's trial testimony.  For these reasons, we reverse the Court of Appeals' judgment in part and remand this case to the trial court for new trials.

Richard H. Bernstein
Stephen J. Markman
David F. Viviano
Elizabeth T. Clement

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

         Plaintiff-Appellee,

v                              No. 154128

JUSTLY ERNEST JOHNSON,

         Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

         Plaintiff-Appellee,

v                              No. 154130

KENDRICK SCOTT,

         Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

I dissent. The majority grants each defendant a new trial on the basis of new evidence that is, in my view, implausible. The majority fails to provide a reasonable and proper basis to reject the trial court's credibility determination in regard to defendants' newly discovered witness, Charmous Skinner Jr. In finding that Skinner's testimony lacked credibility, the trial court identified three pertinent facts: (1) Skinner was only 8 years old at the time of the murder and his previously undisclosed memory, offered some 16 years later, could not be certain, (2) Skinner's view of the shooting likely would have

been obstructed and limited by the existing conditions as well as Skinner's proximity in the car in which he was seated at the time of the shooting, and (3) Skinner's prior perjury conviction.[1] These three findings are more than enough to conclude that the trial court did not clearly err by determining that Skinner's testimony was not credible.

Further, I disagree with the majority that the trial court failed to properly assess the effect of the newly discovered evidence in conjunction with the evidence that was presented at the original trials. Judge Prentis Edwards presided over both of defendants' trials and presided over Johnson's three previous motions for relief from judgment. After the retirement of Judge Edwards, the instant postjudgment matters in defendants' cases were transferred to Judge James Callahan. Contrary to the conclusions reached by the majority, Judge Callahan did not position himself "as an appellate court where the credibility of witnesses at the preliminary examination and the original trials was concerned." Rather, Judge Callahan only highlighted that the evidence relied upon by Judge Edwards at defendant Johnson's bench trial was consistent with the district court's findings at the preliminary examination and the evidence supporting the jury's verdict in defendant Scott's trial. Yet, the majority ignores these previous findings and fails to give regard to the special opportunity Judge Edwards and the district judge had to assess and weigh the credibility of the witnesses who appeared before them. The fact is Judge Callahan merely acknowledged that the district judge and Judge Edwards both opined

---

[1] The trial court also concluded that Skinner was, in all likelihood, asleep at the time of the shooting. The prosecutor conceded in the Court of Appeals that this reason was speculative and unsupported by the record, and thus clearly erroneous. Accordingly, this reason has not been disputed before this Court.

that witnesses Antonio Burnette and Raymond Jackson were credible. And their findings were confirmed by Scott's jury, which rendered a verdict of guilty after a mere 1½ hours of deliberation.

Instead, the majority relies on alleged "inconsistencies" during the Johnson bench trial to override the findings of Judge Edwards that supported Johnson's murder conviction. Significantly, Judge Edwards did not rely on a single piece of evidence upon which the majority relies to vacate defendants' convictions. Rather, Judge Edwards, a seasoned trial judge with many years' experience, considered and assessed this evidence and properly dismissed it, attributing it to reluctant witnesses who were trying, in his words, "to minimize the impact that [their testimonies] might have on [Johnson]." Judge Edwards found that these witnesses, particularly Burnette, were fearful and attempted to tailor their testimony to provide Johnson an alibi. Because of this, Judge Edwards rejected this equivocating and inconsistent aspect of the witnesses' testimony, and rightly so.

In addition, the majority compounds its error by reviewing the testimony of Burnette and Jackson in Scott's jury trial in light of the so-called inconsistencies between the testimony presented at the preliminary examination and the testimony presented at Johnson's bench trial. The majority does not, however, identify any inconsistencies between these witnesses' testimony presented at the preliminary examination and Scott's jury trial. Thus, the majority has undermined the jury's verdict in the Scott case solely on the basis of the so-called inconsistencies presented at the Johnson trial, which, again, were explained and ultimately rejected by Judge Edwards. As explained more fully in this opinion, I would affirm the judgment and opinion of the Court of Appeals.

3

## I. STANDARD OF REVIEW

This Court reviews a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion.[2]  An abuse of discretion occurs when the trial court renders a decision that is outside the range of principled decisions.[3]  "A mere difference in judicial opinion does not establish an abuse of discretion."[4]  A trial court's factual findings are reviewed for clear error.[5]  A factual finding is clearly erroneous when "the reviewing court, on the whole record, is left with a definite and firm conviction that a mistake has been made."[6]

" 'This Court has repeatedly held that a trial judge, in passing on a motion for a new trial, is vested with a large discretion.  The wisdom of such rule is obvious.  The judge has the advantage of seeing the witnesses on the stand, of listening to their testimony, of noting the attitude of the jury to various matters that may arise during the trial, and is in far better position than is an appellate court to pass on questions of possible prejudice, sympathy, and matters generally that occur in the course of a trial but which do not appear of record.' "[7]

---

[2] *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003).

[3] *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012).

[4] *Cress*, 468 Mich at 691.

[5] MCR 2.613(C) ("[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.").

[6] *Bynum v ESAB Group, Inc*, 467 Mich 280, 285; 651 NW2d 383 (2002).

[7] *People v Tyner*, 497 Mich 1001, 1002 (2015), quoting *Alder v Flint City Coach Lines, Inc*, 364 Mich 29, 38; 110 NW2d 606 (1961) (CARR, J., concurring).

## II. ANALYSIS

For a new trial to be granted on the basis of new evidence, a defendant must show that

> (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial.[8]

The defendant carries the burden of satisfying all four prongs of this test. Throughout the litigation, the first three prongs of this test have not been disputed, and the focus of this opinion is whether defendant has established that the newly discovered evidence makes a different result probable on retrial.

Ordinarily "motions for a new trial on the ground of newly-discovered evidence are looked upon with disfavor, and the cases where this court has held that there was an abuse of discretion in denying a motion based on such grounds are few and far between."[9] That is because "[t]he policy of the law is to require of parties care, diligence, and vigilance in securing and presenting evidence"[10] and "[t]he principle of finality is

---

[8] *Cress*, 468 Mich at 692 (quotation marks and citation omitted).

[9] *Rao*, 491 Mich at 279-280, quoting *Webert v Maser*, 247 Mich 245, 246; 225 NW 635 (1929) (quotation marks omitted).

[10] *Canfield v City of Jackson*, 112 Mich 120, 123; 70 NW 444 (1897) (quotation marks and citation omitted). See also 39 Am Jur, New Trial, § 156, p 163 ("Such applications . . . are entertained with reluctance and granted with caution . . . because of the manifest injustice in allowing a party to allege that which may be the consequence of his own neglect in order to defeat an adverse verdict."); 58 Am Jur 2d, New Trial, § 297, pp 318-319.

essential to the operation of our criminal justice system."[11]  In fairness to both parties and the overall justice system, the law requires that parties secure evidence and prepare for trial with the full understanding that, absent very unusual circumstances, the trial will be the one and only opportunity to present their case.  It is the obligation of the parties to undertake all reasonable efforts to marshal all the relevant evidence for that trial.  Evidence will not ordinarily be allowed in piecemeal.  *People v Cress*[12] set forth the showing that a defendant must make in order to satisfy the exception to this rule and struck a balance between upholding the finality of judgments and unsettling judgments in the very unusual case in which justice under the law requires a new trial.[13]

### A.  THE TRIAL COURT PROPERLY REJECTED THE NEWLY DISCOVERED EVIDENCE

I disagree with the majority that Judge Callahan clearly erred by concluding that the testimony of Charmous Skinner Jr. was not credible.  Consequently, I conclude that Judge Callahan did not abuse his discretion by denying defendants' motions for relief from judgment.  The Court of Appeals correctly focused on four reasons upon which Judge Callahan relied to conclude that Skinner was not credible:

> (1) Skinner was only eight years old at the time of the murder and his memory some 16 years later could not be certain; (2) it would have been incredibly difficult for Skinner to be inside a car at night and see someone outside the vehicle when the only illumination was from the vehicle's

---

[11] *People v Maxson*, 482 Mich 385, 398; 759 NW2d 817 (2008) (quotation marks and citation omitted).

[12] *Cress*, 468 Mich 678.

[13] See MCR 6.431(B) (providing that the trial court "may order a new trial . . . because it believes that the verdict has resulted in a miscarriage of justice").

interior dome light, especially when considering that both [the victim] and the car door were between [Skinner] and the shooter; (3) Skinner had already been convicted for perjury; and (4) in any event, Skinner likely would have been asleep inside the car at the time of the murder.[14]

The first three of these four reasons[15] support Judge Callahan's opinion such that his conclusion that Skinner was not credible is within the range of principled outcomes. For the first reason, the Court of Appeals correctly stated that "[c]ommon sense dictates that memories can fade and events that occurred such a long time ago would no longer be fresh in the witness's mind."[16] Defense expert Katherine Rosenblum, a clinical and developmental psychology expert, testified to the possibility of a "narrowing of attention" during moments of high traumatic stress. Rosenblum testified that an 8-year-old *could remember* the face of a perpetrator 16 years later. She testified in general terms, however, and could not testify as to Skinner's memory because she had never actually interviewed him. Rosenblum further conceded that exaggeration of facts is possible with the passage of time. Rosenblum also acknowledged that it was possible that an investigative reporter with whom Skinner had contact could have "planted a seed" in Skinner's mind that the wrong people were convicted. To this point, Skinner acknowledged on cross-examination that, after the reporter contacted him, he read some of the reporter's news articles about the case on the Internet and developed an impression that the police had done a poor job in investigating the case. Thus, it was only after the

---

[14] *People v Johnson*, unpublished per curiam opinion of the Court of Appeals, issued May 31, 2016 (Docket No. 311625), p 6.

[15] As to the remaining reason, see note 1 of this opinion.

[16] *Johnson*, unpub op at 6.

reporter first contacted Skinner in 2011 and after Skinner's own investigation about the incident that he gave a description of the shooter to the reporter and later to the Michigan Innocence Project (MIP).

I agree with the Court of Appeals that Judge Callahan's concern regarding the lengthy passage of time from the murder to the discovery of Skinner's testimony was well-founded. Skinner's claim that he "will never forget the person's face," and his certainty that he could "recognize that man if [he] saw him today," is, at best, an exaggeration of any memory that he did have of the event, and it is more likely that he had no memory of it at all. At minimum, I cannot conclude that Judge Callahan's decision in this regard was clearly erroneous.[17]

---

[17] Another aspect that I find troubling with Skinner's testimony is his assertion that he told the Wisconsin Innocence Project (WIP) in 2007 that he could identify the shooter, and yet the WIP did not further inquire.

> [*The Prosecution*]: When the Wisconsin Innocence Project contacted you, what did they say to you?
>
> [*Skinner*]: "Did you see what happened to your mother?"
>
> [*The Prosecution*]: And what did you say to them?
>
> [*Skinner*]: "Yes."
>
> [*The Prosecution*]: You said "yes"?
>
> [*Skinner*]: Yeah.
>
> [*The Prosecution*]: And did they ask you if you could describe the person who did the shooting?
>
> [*Skinner*]: No.
>
> [*The Prosecution*]: They didn't ask you that?

The majority gives short shrift to the second reason that Judge Callahan found Skinner's testimony incredible and does not expressly rule whether this finding was clearly erroneous. Specifically, Judge Callahan concluded that Skinner's view from inside the van was obstructed and not illuminated. The evidentiary hearing transcript demonstrates that Judge Callahan extensively questioned Skinner regarding his viewpoint and the positioning of his mother with respect to the shooter. Skinner testified that he had climbed into the front passenger seat and that his mother was shot while she was entering the driver's side of the van. He further testified that the shooter stood behind his mother but "a little off to the side."[18] The Court of Appeals panel explained that "when Skinner heard the gunshot, the door window shattered, and [the victim] managed to fully get into the car, close the door, and speed away before eventually dying at the nearby gas

---

[*Skinner*]: No.

[*The Prosecution*]: Okay, you told them that you had seen the shooting, correct?

[*Skinner*]: Yes.

[*The Prosecution*]: And they didn't ask you if you could identify the person, if you could describe them?

[*Skinner*]: No, they said they was [sic] going to fly out to Pennsylvania to come meet with me. Never heard from them again.

[*The Prosecution*]: Do you remember when that was?

[*Skinner*]: I was—'07. It was 2007.

I find this testimony dubious given the substantial amount of investigative work the WIP conducted into this matter.

[18] The record contains a rough sketch by Skinner illustrating the respective positions.

9

station."[19]  Judge Callahan reasonably opined that, based on this testimony, the position of Skinner's mother entering the car would have obstructed Skinner's view of the shooter.  The Court of Appeals agreed, highlighting that "any view of the shooter from the passenger seat would have been obstructed.  Not only was [the victim] positioned between Skinner and the shooter, but the car door was as well."[20]

Further, Skinner also testified that, despite the darkness outside the van, he saw the shooter only from the dome light in the car.  The Court of Appeals noted that Judge Callahan "correctly was skeptical that an interior dome light would enable one sitting inside the vehicle to see outside the vehicle with any meaningful clarity."[21]  Judge Callahan stated: "Anyone who has ever been in a car in the pitch of night, pitch black . . . nighttime and turns on a dome light, restricts the light.  The light does not shine outside.  The light does confine itself to the interior of the van or the car."  And, as the Court of Appeals pointed out, "Skinner did not testify that the shooter leaned inside the car or was ever located near the door opening while the door was open, such that he would have been more likely to have been illuminated by the interior light."[22]  The Court of Appeals panel reasonably concluded that "with the shooter having to shoot through the door window, it is certain that he was positioned on the other side of the door and not

---

[19] *Johnson*, unpub op at 6.

[20] *Id*. at 7.

[21] *Id*. at 6.

[22] *Id*.

near the door opening, where the light would have been better."[23] In sum, this was a common-sense finding with regard to Skinner's ability to clearly see the shooter's face.[24] Like the Court of Appeals, I cannot conclude that this finding was clearly erroneous.

The majority accepts, and I agree, with the third reason upon which Judge Callahan relied to reject Skinner's credibility.[25] "[C]rimes having an element of dishonesty or false statement are *directly* probative of a witness'[s] truthfulness . . . ."[26] Skinner was not only convicted of a crime of dishonesty, but he was convicted of a crime that is arguably the most relevant to his credibility while under oath—perjury. As the Court of Appeals majority properly concluded, "[T]he fact that [Skinner] had no qualms

---

[23] *Id*.

[24] See M Crim JI 3.5(5) (providing that the fact-finder "should only accept things the lawyers say that are supported by the evidence or by your own *common sense* and *general knowledge*") (emphasis added).

[25] Had Judge Callahan based his credibility determination solely on Skinner's criminal record and not considered that record in the context of the other evidence presented at the evidentiary hearing and the trial, I would be more receptive to the majority's view. See *People v Love*, ___ Mich ___ (2018) (Docket No. 155545) (ZAHRA, J., dissenting). But that is not the case here. As previously stated, the perjury conviction together with the 16-year lapse of time that allowed for Skinner's memory to fade, Skinner's proximity to the shooter, and the lighting conditions that existed at the time of the shooting combine to strongly support the credibility finding of Judge Callahan.

[26] *People v Allen*, 429 Mich 558, 571; 420 NW2d 499 (1988); see also MRE 609(a)(1) ("For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall not be admitted unless the evidence has been elicited from the witness or established by public record during cross-examination, and . . . the crime contained an element of dishonesty or false statement . . . .").

about violating his oath to tell the truth regarding something as serious as a murder rightfully caused [Judge Callahan] here to be concerned."[27]

And I agree with the majority that Judge Callahan improperly speculated when surmising that Skinner was likely asleep at the time of the incident. But I conclude that three of Judge Callahan's proffered reasons clearly call Skinner's credibility into question. Accordingly, I cannot conclude that Judge Callahan abused his discretion by denying defendants a new trial on this basis.

Having concluded that defendants are not entitled to relief on their claims of newly discovered evidence under MCR 6.502(G)(2), I would not consider evidence that Johnson presented in previous motions for relief from judgment because "[t]he court may not grant relief to the defendant if the motion . . . alleges grounds for relief which were decided against the defendant in a prior . . . proceeding under this subchapter . . . ." MCR 6.508(D)(2). But, because the majority disagrees and finds Skinner arguably credible, I will further discuss whether, in my view, the new evidence in conjunction with this previously presented evidence makes a different result probable on retrial.

### B. THE EFFECTS OF THE NEWLY DISCOVERED EVIDENCE WERE CONSIDERED IN LIGHT OF THE TRIAL EVIDENCE AND PROPERLY REJECTED BY BOTH LOWER COURTS

The majority fails to appreciate the trial evidence that led to defendants' convictions and instead focuses on the evidence set forth during defendants' collateral attacks. The prosecution's cases against Scott and Johnson were unquestionably

---

[27] *Johnson*, unpub op at 7.

grounded on circumstantial evidence. The evidence also consistently shows that the prosecution's key witnesses—Burnette and Jackson—were intimidated and reluctant to testify against defendants. A comprehensive examination of the evidence presented at defendants' original proceedings is necessary to demonstrate overall consistency.

## 1. THE PRELIMINARY EXAMINATION

At the preliminary examination, Burnette's testimony was straightforward. He testified that on May 8, 1999, at around 6:00 p.m., he saw Scott at a store and they returned to Scott's house. Burnette testified that he was waiting for his father to pick him up. At Scott's house, he saw Johnson. At this point during the testimony, the prosecution attempted to elicit testimony from Burnette that defendants told him they planned to "hit a lick." At first, Burnette said he could not recall. Then, notably, the district court interjected and stated the following:

> Officers, I want the courtroom all cleared out. I see people cringing and eye movement and I want as clear a conversation as can be. I don't want any suggestions coming from the audience.
>
> Now, the only one who . . . hasn't been moving around and looking, is that man standing right there, holding his hand, and I will let him stay. Everyone else out.
>
> I heard laughter from back there. I have been watching you all on the front, lady in the green going like this, and the woman with the red hair going like this. All of you out. The only one who hasn't been moving around is this man.

Afterward, the prosecution confronted Burnette with the statement he made to the police:

> [*The Prosecution*]: You recall what you told the investigators about what [Johnson] and [Scott] were talking about that night, correct?

[*Burnette*]:  Yes.

* * *

[*The Prosecution*]:  Do you remember that now?

[*Burnette*]:  Yes.

[*The Prosecution*]:  Can you tell the Judge what they told you that night before your daddy came?

[*Scott's Attorney*]:  We would object to the witness reading from the statement, your Honor.

*The Court*:  Well, I'll let him read— He doesn't have the statement.

[*The Prosecution*]:  I've got the statement.

[*Scott's Attorney*]:  He was looking down.  I didn't know.

*The Court*:  He's looking down to keep from looking at your clients that keep looking at him and touching their face.  I don't know if it's a threat, or sign language within the community, or what.

[*Scott*]:  I wasn't doing nothin'.

*The Court*:  Oh, you did like this and you did like this.

[*Scott*]:  I have a nervous problem.

*The Court*:  And like this and like that.  And the one named Stank, he did like this goes like this, glaring at him.  I don't know what those looks in the neighborhood mean.  It's just like I don't know what lick means.[28]

---

[28] If there is any doubt that defendants were threatening him, it was later resolved during his cross-examination:

*The Court*:  Well, I'm watching [Burnette's] demeanor and it seems like he's scared to death of these two young men that you are representing.

[*Scott's Attorney*]:  That may be true, your Honor.  That may be the Court's interpretation.  Maybe he's not afraid of these guys.

Are you afraid of these men at this time?

14

The prosecution again asked Burnette what defendants told him. Scott's attorney again objected, and the district court overruled the objection. Burnette started to answer, but Scott's attorney interrupted, stating, "I can't hear," which prompted the court to state:

> Come on, young man. I know you're 16 and this is scary for you, but talk into the mic and tell the truth. That's all the Court wants to hear, is the truth. Now, answer the question.

Finally, Burnette replied, "They was [sic] talking about hitting a lick," which he later explained means "[r]obbing somebody." He also mentioned that defendants had asked about his plans that evening, suggesting that he participate, but Burnette declined and mentioned that his father was coming to pick him up.

Burnette then testified that he returned to Scott's house at 2:30 a.m. Defendants were at the house. Burnette testified, reluctantly, that Scott told him "a lady had got shot." Burnette further testified that Scott said "[h]e had a phone bill that he had to pay" and "[s]he wouldn't come out of no money." He testified that Scott had a .22 rifle and that Johnson had an AK-47. Burnette then testified that Scott's girlfriend arrived in the

---

[*Burnette*]: Yes.

* * *

[*Scott's Attorney*]: Terrible answer, your Honor.

[*The Prosecution*]: Well—

*The Court*: Well, I've been sitting here awhile and I've seen a number of cases, and I can usually call it pretty good.

[*Scott's Attorney*]: You did a good job that time.

15

morning and that Scott took the weapon with him, that he heard a trunk pop, and that Scott put the gun in the trunk. Similarly, he testified that Johnson's girlfriend arrived with a sheet and that Johnson wrapped up the gun and put it in the trunk.

Raymond Jackson testified that he knew Scott and that Scott's girlfriend was his neighbor. He testified that he was awoken on May 9, 1999, by a loud noise. He spoke with his grandmother, put on some clothes, looked outside, and saw Scott hand something to his girlfriend. He went outside. Scott joined him, but the police arrived and took Scott and Jackson downtown for questioning. Later that day, after his interview, Jackson returned home. Johnson stopped over while drinking a 40-ounce beer. Jackson testified that Johnson told him that he and Scott had "hit a lick" and, in Jackson's words, Johnson "implicated" Scott, later explaining that Scott "fucked up and had to shoot."

In binding defendants over for trial, the district court expressly stated, "I just want to say both witnesses are very believable." The court noted that Burnette had admitted in open court that he was afraid of defendants yet still testified. The court also opined that Jackson was afraid and pointed out that he was being held in protective custody but was still housed on the same jail floor as defendants. Apparently, one defendant threatened Burnette with violence and the other taunted him by calling out his name the previous night.

## 2. JOHNSON'S BENCH TRIAL

Johnson opted for a bench trial. Unlike the majority, I believe we are bound to accept Judge Edwards's findings, none of which can be claimed to be clearly erroneous,

16

and all of which are consistent with the evidence presented at the preliminary examination. After the bench trial, Judge Edwards opined:

> The most important evidence that we received as part of the prosecution's case was that from Antonio [Burnette] and Raymond Jackson. Antonio [Burnette], who apparently also is known by the name of Shortie, gave testimony regarding the fact that he was with this defendant and Kendrick Scott earlier in the evening, and that during the time that he was with the two of them there was a discussion regarding hitting a lick. He indicated that one interpretation or one definition of that term or phrase is pulling a holdup, sticking someone up. And he indicated that he was invited to participate in that activity, and apparently he declined. He indicated that around 10:30 p.m. his father picked him up and took him to visit some other relatives, and that at around 2:30 a.m. he returned to that area and again was in contact with this defendant and Kendrick Scott. He indicated that at that time, approximately that time this defendant made a statement indicating that Kendrick Scott had shot someone. The reason for the shooting, apparently that was offered was that she would not give up the money. That would suggest that something happened during the holdup that didn't go as planned, and the person was shot.
>
> The statement was made to Antonio, according to his testimony, that Kendrick Scott did the shooting and it was done because the money was not given up. He indicated also that he saw this defendant wrap what appeared to be a long gun in a sheet and later put it in his girlfriend's car. The testimony of Raymond Jackson was somewhat supportive of the testimony given by Antonio [Burnette]. He indicated that he heard the shot outside of his home; he was asleep, he woke up, he went outside. The following day this defendant came to his home and he had [a] conversation with this defendant. And by the way, Raymond Jackson had indicated that he had been drinking. He indicated that when he saw this defendant on that morning, that the defendant appeared to have been drinking also. Raymond Jackson indicated that he been taking some drugs, but he said he did have the conversation with him, and that this defendant said that he had to hit a lick and that he messed up and he had to shoot. He indicated also that he was with Scott, Kendrick Scott at the time that that occurred. Raymond Jackson also told us about the threatening, what he interpreted as being threatening activities of the defendant towards him, threatening remarks that he made after he had been taken down to the lockup at the police station.

17

* * *

Eugene Jackson, who is the brother of Raymond Jackson testified. He indicated that Raymond had told him something about defendant hitting a lick, shooting dice; but he also indicated that he had told his brother that he didn't appreciate, and this happened during the course of the trial, that he did not appreciate how he was testifying. And to that Raymond indicated that he was telling the truth.

We had the defendant Johnson, Mr. Johnson, Justly Johnson testify. He denied any involvement in the shooting. He denied having anything to drink, taking any type of drugs; denied that he made any statements to Antonio [Burnette] or to Raymond Jackson. He indicated that they're lying. He indicated that he did go to the home of Raymond Jackson and that after he was there, he made a phone call; he was on the phone for 6 to 15 minutes, I believe he said, and that he knew that the police were looking for him, and that he went out and turned himself in to the police.

Judge Edwards acknowledged that credibility was the central issue in this case. He found the following in regard to the credibility of Burnette and Raymond Jackson:

[A]lthough it seems to me that both were very reluctant, and they did everything that they could do to try to minimize the impact that it might have on this defendant.

It appears that they are friendly. It's nothing to suggest that they have any ax to grind, any reason to come into this courtroom and to lie. Testimony of Raymond Jackson, I thought, was very sincere. And in spite of what appears to have been threats from his brother, threats from this defendant, he tried to hedge his testimony in a way that would be favorable to the defense, but he gave what I believed to be very honest and sincere testimony about this defendant's involvement in the offense.

The testimony from [Burnette] was not as forth coming. We had some difficulty even in getting him to keep his voice up so that we could hear. He indeed appeared to me to be a very reluctant witness. He did not want to be a part of this, and that's probably accounted for by the fact that he's a good friend. At least at the time that this thing apparently took place, he was a good friend, they were together for a good deal of that evening preceding the shooting and even after the shooting, and the defendant had enough trust in him to confide in him that he was going to hit a lick and

18

later gave information that they did indeed hit a lick, and that someone was shot.

Judge Edwards convicted Johnson of felony murder, assault with intent to rob while armed, and possession of a firearm during the commission of a felony.

The majority erroneously believes that Burnette's prior trial testimonies are not credible because Burnette failed to provide a "consistent narrative" throughout the proceedings. As Burnette began to testify at Johnson's bench trial, it quickly became clear that he would again be a reluctant witness. Contrary to his preliminary examination testimony, Burnette at first denied that Johnson participated in any conversation about "hitting a lick." He also testified that upon returning to Johnson's house at around 2:30 a.m., he and Johnson went to a female's home, got in a car with another person, went to Burnette's sister's house, and found that she was not home, following which Burnette and Johnson returned to Johnson's house. Burnette further testified that after he and Johnson returned to Johnson's house, Scott was there. Burnette testified that there was a conversation and that Johnson said that Scott had shot someone. Burnette denied any indication that Johnson participated in the shooting and stated that he first learned of the shooting when he saw an ambulance and police cars.

This testimony was not given at the preliminary examination. But while Burnette's differing testimony may appear at first to be a *non sequitur*, after reviewing defense counsel's cross-examination and defendant's closing argument, it becomes clear that Burnette's sentiments, for whatever reason, favored Johnson. That is, Johnson would eventually rely on this "new" testimony to argue that he and Burnette were together without Scott at the time of the murder. Eventually, after the prosecution repeatedly

19

refreshed Burnette's memory with his police statement and his testimony at the preliminary examination, Burnette became more forthcoming and the prosecution was by and large able to elicit testimony comparable with that given at the preliminary examination. And sensing the motive for Burnette's inconsistent testimony, the prosecution laid the following foundation to admit his prior statements:

> [*The Prosecution*]: Have you received any communications, also, about anything that was going to endanger you?
>
> [*Burnette*]: Yes.
>
> [*The Prosecution*]: Okay. And was that after you had given a statement to the police and until today?
>
> [*Burnette*]: Yes.
>
> [*The Prosecution*]: What specifically were you told?
>
> [*Burnette*]: When I got out of lock-up I was going to get killed.
>
> [*The Prosecution*]: Does that trouble you?
>
> [*Burnette*]: Don't bother me.
>
> [*The Prosecution*]: You're not concerned about it?
>
> [*Burnette*]: No, I'm just concerned about my family.
>
> [*The Prosecution*]: Okay. And your family still lives in that same area?
>
> [*Burnette*]: Yes.

Clearly, Burnette's prior statements from the preliminary examination were admissible under MRE 801(d)(1) because he testified at the trial or hearing and was subject to cross-examination concerning the statement and because the statement was "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the

20

declarant of recent fabrication or improper influence or motive . . . ." The majority fails to acknowledge the obvious "consistent narrative" that explains Burnette's inconsistent testimony, which is that he was under threat during the proceedings.

Judge Callahan expressly stated in his opinion that Judge Edwards "indicated that he was impressed by the testimony of both of those individuals [Burnette and Jackson] when confronted with adverse influences that might have affected them from expressions by the defendants as well as communications that were had with Mr. Jackson by his brother." Also, Judge Edwards did not rely on a single piece of evidence that the majority cites as inconsistent. He rejected this evidence, attributing it to the result of reluctant witnesses who were trying, in his words, "to minimize the impact that [their testimonies] might have on [Johnson]." Judge Edwards explained that witnesses Burnette and Jackson had once been friends with defendants. But after being subpoenaed to testify against defendants, these witnesses received death threats before and during the trials. Judge Edwards sifted through the testimony and discounted the arguably equivocal and inconsistent testimony and found persuasive the circumstantial evidence against defendants. This is exactly the type of finding from a seasoned trial judge that deserves deference. The prosecution takes the witnesses as it finds them. The prosecution rarely has the luxury to parade cooperative witnesses with perfect character into court. This is particularly true in cases that originate in high crime areas, where witnesses fear retaliation for cooperating with the police. In this case, Judge Edwards observed these witnesses while they testified. He considered their words and the manner in which they were conveyed. In sum, Judge Edwards clearly understood that these witnesses,

particularly Burnette, attempted to tailor their testimony to provide Johnson an alibi.[29] Therefore, even assuming that Skinner was credible, his testimony would not make a different result on retrial probable given the evidence that defendants made threats to Burnette and Jackson in connection with their testimony and given that Judge Edwards found Burnette and Jackson to be credible. It is beyond dispute that it is within the province of the fact-finder to resolve a conflict in the evidence.[30]

### 3. SCOTT'S JURY TRIAL

In addition, the majority compounds its usurpation of Judge Edwards's findings by reviewing the testimony of Burnette and Jackson in Scott's jury trial in light of the so-called inconsistencies between their testimony presented at the preliminary examination and their testimony presented at Johnson's waiver trial. The majority does not identify any so-called inconsistencies between these witnesses' testimony presented at the preliminary examination and Scott's jury trial. And the majority does not acknowledge that the evidence against Scott was far stronger than the evidence presented in Johnson's bench trial.

---

[29] Burnette's recantation testimony, greatly relied on by the majority, is simply an extension of Burnette walking back his incriminating testimony that Judge Edwards rejected both at Johnson's bench trial and Johnson's second motion for relief from judgment (presenting new evidence that Burnette had recanted his trial testimony). Further, this Court has long stated that "recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true." *People v Van Den Dreissche*, 233 Mich 38, 46; 206 NW 339 (1925) (quotation marks and citation omitted); see also 3 Wright & Welling, Federal Practice and Procedure (4th ed), § 585, pp 480-482 ("The judicial attitude is that recantation should be 'looked on with the utmost suspicion.' ") (citation omitted).

[30] See *People v Henssler*, 48 Mich 49, 51; 11 NW 804 (1882).

22

At Scott's trial, Burnette's testimony was concise and given without any apparent reluctance despite the fact that Burnette had continued to receive threats in connection with his involvement. At trial, he recalled additional details; for instance, Burnette testified that Scott knew the victim's first name, that Scott wanted to kidnap her, and that defendants afterward told Burnette the exact location of the shooting. In addition, the prosecution presented testimony from Lillie Harris, William Kindred's sister. Harris was then engaged to Verlin Miller, whose home Kindred had stopped by to discuss purchasing a motorcycle. It was during this conversation that the victim was shot outside the home, and both Kindred and Miller gave chase to a person across a field. Miller at some point called Harris, and she went outside to look for him. Harris testified that at this time a car approached her and that she recognized Scott from the old neighborhood. She testified that Scott called out to her by her nickname, "Peggy," and that she approached the car. Scott then asked her if she saw "two guys run by here with a shotgun." She testified that she was immediately suspicious and that Scott then told her that he saw two guys shoot a lady in a white van, which made her more suspicious. While defense counsel did elicit on cross-examination that she had not mentioned that Scott said anything in her statement to the police, her statement did identify Scott as one of the two people in the car that approached her near the crime scene that evening. The prosecution also presented evidence that a .22 rifle with the name "Snooky" etched into the stock was discovered in the basement ceiling in the home of Faylynn Kenner, who was Scott's girlfriend at the time. The witnesses who knew Scott only referred to him at trial as "Snooky," "Snoop," or "Snoopy." The jury rendered a verdict of guilty after a mere 1½ hours of deliberation.

23

The majority has failed to conduct an independent analysis of Scott's trial and has essentially undermined the jury's verdict by relying solely on the so-called inconsistencies presented at Johnson's bench trial, which, again, were rejected by Judge Edwards. With regard to the credibility of witnesses of concern at Johnson's bench trial, namely Burnette and Jackson, both testified about the continued threats made against them before and during Scott's jury trial and yet testified consistently with their testimony given at the preliminary examination.

III. CONCLUSION

I agree with the trial court and the Court of Appeals that defendants' newly discovered evidence is not credible. Even assuming the evidence was credible, I disagree with the majority that this evidence would have made a difference on retrial, particularly in regard to Scott's jury trial in which the evidence, albeit circumstantial, was just short of overwhelming. Accordingly, I would affirm the Court of Appeals' decision that the trial court did not clearly err by denying defendants' motions for relief from judgment.


Brian K. Zahra


MCCORMACK, J., did not participate because of her prior involvement in this case as counsel for a party.

WILDER, J., did not participate because he was on the Court of Appeals panel that decided defendants' motions for peremptory reversal.

24