*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

ROGER CARLOS RAY,

      Defendant-Appellant.

UNPUBLISHED
October 03, 2024
10:35 AM

No. 365913
Wayne Circuit Court
LC No. 93-004008-01-FC

Before: MURRAY, P.J., and BORRELLO and MARIANI, JJ.

PER CURIAM.

Defendant appeals by delayed leave granted[1] the trial court's order denying his third successive motion for relief from judgment. On appeal, defendant argues the trial court abused its discretion when it denied his third successive motion under MCR 6.502(G)(2), which was predicated on: (1) newly discovered evidence; (2) a *Brady*[2] violation; (3) his actual innocence; and (4) ineffective assistance of counsel. We agree in part, vacate the order denying defendant's motion, and remand to the trial court for an evidentiary hearing on whether the newly discovered evidence satisfies the fourth prong under *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003), and/or constitutes material evidence under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). We retain jurisdiction.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

This case arose from the murder of John Holmes in 1987. Although the murder occurred in 1987, trial did not take place until 1993. At trial the main witness against defendant was Edmond Wright. Also testifying for the prosecution were Detroit Police Officers Bobby Gary and William Simmons, Wright's girlfriend Lisa Shepard, Denise Barnett, Clarence Bell, evidence technician

---

[1] *People v Ray*, unpublished order of the Court of Appeals, entered August 21, 2023 (Docket No. 365913).

[2] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

Frank Horan, and Federal Bureau of Investigation special agent Prince Ross. The testimony at trial provided the following sequence of events.

On April 19, 1987, Holmes was killed by blunt force trauma to the head and a single gunshot wound. His charred body was discovered in an apartment building's boiler room. Holmes was the assistant manager of the apartment building and worked part-time as its caretaker. He often loaned money to the building's residents at high interest rates, carried large sums of money on him, and frequently carried a gun. Wright lived in the building and shared an apartment with defendant and Shepard. Defendant paid Wright $300 rent, and sold crack cocaine from the apartment.

April 19, 1987 was Easter Sunday. Wright had spent most of that weekend at his mother's house with Shepard, but stopped by the apartment to pick up clothes for Shepard. When Wright arrived at the apartment, defendant opened the door, was shirtless and sweating, and had "blood all on him." Upon entering the apartment, defendant—who was holding a gun—told him to "shut the f**k up and sit down." Another person, who Wright did not know, was "standing at the door with a gun." Wright saw "a safe in the middle of the floor and a whole bunch of stuff on the floor." The safe belonged to Holmes, and the papers on the floor had Holmes's name on them. In one bedroom, Wright saw "brain matters [sic] and stuff, blood," as well as Holmes's hat and flashlight, on the floor near a fuse box.

According to Wright, defendant ordered him "to clean everything up and help [defendant] get that together, what was in the house." Wright complied. Defendant and Wright moved everything in the apartment to a dumpster.[3] While doing so, defendant told Wright that "he hit [Holmes] in the head and [Holmes] fell down and [defendant] shot him." Before taking the safe to the dumpster, defendant admonished Wright not to inform the police, and told Wright to meet at a Coney Island restaurant later because he was going to "give [Wright] some money to shut up or not say anything[]. . . ."

Two days later, after receiving a phone call from Wright that he could not locate Holmes, Clarence Bell, the apartment building's owner, went looking for Holmes. Bell explained that there was a "smoky smell in the area," and when he entered the boiler room he saw "a face that was burned, with all the skin burned off it." Bell called the police.

Gary, an investigator for the Detroit Police Homicide Section, testified that Wright was cooperative with police, made statements to homicide detectives, and allowed the police warrantless access to his apartment to take photographs, collect evidence, and draw a diagram of the apartment. At trial the parties stipulated to admission of statements Wright made to police on April 21, 27, and May 1, 1987, which were read into the record.

In his first statement on April 21, Wright did not mention defendant to the police. In his second statement on April 27, Wright noted that he saw defendant covered in blood, without a

---

[3] Shepard was waiting in the car during this time. After a while, she went to the apartment to ask about Wright. Defendant answered the door without opening it all the way, and "told her to go back outside," which she did.

shirt, and saw the safe and papers in the apartment's living room. Wright made his third statement on May 1, and provided more information to police: "While we, me and [defendant], were taking the items to the dumpster, [defendant] told me that he had shot Mr. Holmes twice in the head and then he had fell to the floor." Wright was extensively cross-examined regarding his statements, and it was defendant's theory that Wright was the one who committed the murder, as Wright knew Holmes, worked with Holmes, and knew about Holmes's access to money. Despite this theory, which was well-advocated by his counsel, the jury convicted defendant of Holmes's murder.

Defendant appealed, this Court affirmed his convictions and sentences, and the Supreme Court denied leave to appeal. *People v Ray*, unpublished per curiam opinion of the Court of Appeals, issued February 27, 1996 (Docket No. 172243), lv den 454 Mich 853 (1997), recon den 454 Mich 853 (1997). The trial court denied defendant's first motion for relief from judgment in 2002, and this Court denied defendant's application for delayed leave to appeal, as did the Supreme Court. *People v Ray*, unpublished order of the Court of Appeals, entered April 21, 2003 (Docket No. 246140), lv den 469 Mich 985 (2003). In 2009, the trial court denied defendant's second motion for relief from judgment, and this Court subsequently denied his delayed application for leave to appeal, as did the Supreme Court. *People v Ray*, unpublished order of the Court of Appeals, entered January 6, 2010 (Docket No. 294318), lv den 488 Mich 887 (2010).

Eight years later defendant filed his third motion for relief from judgment. In it, he argued that a licensed private investigator obtained documents from the Detroit Police Department related to Holmes's homicide, which included a "Detroit Police Homicide Section miscellaneous file." The miscellaneous file contained a redacted photocopy of Wright's identification card found by police in Holmes's apartment, with a note stating: "This ID was found wedg[ed] between [the] seat on [the] sofa in [the] living room of [Holmes's] apartment[.]" The file also contained a handwritten note stating:

> "Something about E. Wright. Advised manager to Att. to get name + phone nbr. of Mr. Mitchel + have same [Mitchell] call [Homicide]. Mr. Mitchell is a friend of Judge Roberts. F.M.H.J." Supervisor of suspect, Edmond Justice Wright stated Edmond called into work sick Monday, 4-20-87. . . . Mr. Edmond called around 8:45A to 900A (work starts at 8:00AM) stated he had a toothache + would not be in to work, and that he would bring in note.
>
> [T]ues. 4-21-87 subject [Wright] came to work + stated he forgot note that he would bring same in Wed. Mr. Edmond came to work Wed. stated manager of Apt where he lived had been killed + that the Police had t/w him and had him looking for papers in his Apt + he forgot about note. Mr. Edmond has not been back to work since.
>
> Advised 2-37 that subject had not picked up his payroll check at Univ. Bearing [Wright's place of employment] + that he was to be arrested if he showed up. Mr. Chonko was also advised to contact #2 desk if Edmond [Wright] came for check . . . .

Defendant submitted an affidavit with his motion averring that he was an active participant in his trial, that he reviewed every document the prosecution provided to defense counsel, and that

his trial materials did not contain Wright's identification card or the note regarding Wright and Jason Mitchell. Defendant stated that, had he "or [defense] counsel known of any of the newly discovered evidence found by [Mischnick][4], [defendant] would have demanded that retained counsel present the same to the jury or raise it in a motion for a new trial on appeal, or on his prior [motion for relief from judgment]."

Mischnick contacted Mitchell, who was named in the homicide note, and interviewed him about Holmes's murder. Mitchell stated in an affidavit that in 1987 he read a newspaper article about the murder. Several days later, Wright invited him to his apartment, as Mitchell was a good friend of Wright's and they often used drugs together. When Mitchell arrived at Wright's apartment, Wright informed him Holmes had money in his safe which Wright wanted, and Wright told Mitchell "he had to get rid of Holmes to get the money." "Wright showed [Mitchell] a stack of money and two .357 magnum pistols, and he asked [Mitchell] if [he] could get rid of the pistols." Mitchell did not get rid of the pistols. Instead, he called Detroit Police, gave his name, and informed them he had information regarding Holmes's murder. Mitchell was placed on hold for a lengthy amount of time, eventually hung up, and never heard back from the police. Several years later, Mitchell encountered Wright, and Wright "told [him] he was upset because [Wright] had to go to court and tell on someone but he didn't tell [Mitchell] who he had to tell on or what it was about." Mitchell noted he did not personally know defendant at the time of Holmes's murder, but had heard of him because defendant sold drugs.

Based on these facts, defendant argued he was entitled to a new trial because Wright was the only witness who provided incriminating evidence against him, and the recently disclosed evidence suggested Wright was a suspect in Holmes's murder, to the point that Detroit Police ordered Wright to be arrested if he showed up for work. The new evidence also showed that police noted Mitchell should be contacted, but they never followed up. Mitchell's affidavit suggested Wright incriminated himself through his statements. This new evidence made a different result probable at a retrial, and implicated defendant's constitutional right to due process, because it was favorable evidence material to defendant's guilt suppressed by the prosecution, resulting in a *Brady* violation.

In response, the prosecution argued MCR 6.502(G)(2) required a successive motion for relief from judgment to show either a retroactive change in the law, or newly discovered, exculpatory evidence. At best, even if the newly discovered evidence could be authenticated, it amounted to impeachment evidence implicating Wright in Holmes's murder, but not exonerating defendant. This made a different result on retrial improbable. Further, the prosecution argued that there was no *Brady* violation because defendant failed to show the suppressed evidence was exculpatory, or would have been likely to change the outcome of his trial.[5]

---

[4] Scott Lewis Mischnick was the private investigator.

[5] Defendant also moved for court-ordered DNA testing, arguing that the police recovered a cigarette butt near Holmes's charred remains, which he opined was left there by the perpetrator. The cigarette butt was placed into evidence and was in the possession of the Detroit Police Department. Defendant requested the cigarette butt be tested for the perpetrator's DNA.

The trial court denied defendant's successive motion for relief from judgment, finding the evidence was newly available rather than newly discovered. Defendant filed a delayed application for leave to appeal, after which this Court vacated the trial court's order and remanded for reconsideration. In doing so this Court acknowledged defendant presented a claim of new evidence, not barred by MCR 6.502(G)(1), and stated:

> On remand, the circuit court shall determine whether relief is warranted pursuant to MCR 6.508(D). To the extent defendant seeks a new trial on the basis of newly discovered evidence, the trial court is directed to apply the four-part test for claims of new evidence. See *People v Johnson*, 502 Mich 541, 566; 918 NW2d 676 (2018); *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003). The circuit court may hold an evidentiary hearing if it concludes one is necessary to evaluate defendant's claims. MCR 6.508(C). [*People v Ray*, unpublished order of the Court of Appeals, entered July 23, 2020 (Docket No. 353421).]

Defendant filed a successive motion for relief from judgment in 2021, raising these same issues. In a thorough opinion, the trial court again denied the motion. In its opinion, the trial court observed a subsequent motion for relief from judgment was permitted under MCR 6.502(G)(2) only if there was a retroactive change in law or a claim of newly discovered evidence. To determine whether the proffered evidence constituted newly discovered evidence, the trial court applied the *Cress* framework. In terms of the first *Cress* factor, the trial court determined the evidence was newly discovered.

The second *Cress* factor required the evidence to be noncumulative. The trial court held that the note stating Wright did not return to work and was a suspect was cumulative, reasoning that defendant's theory of the case was that Wright murdered Holmes. That the note suggested Wright was a suspect was not a new fact and could have been inferred throughout the trial. The trial court held the note regarding Wright's identification card was also cumulative because evidence was introduced at trial that Wright had been in Holmes's apartment. The trial court opined it was speculative at best to conclude that the presence of Wright's identification at the apartment was evidence of Wright recently being there. The note regarding Mitchell, however, satisfied this factor.

The third factor required defendant to show the evidence could not have been reasonably discovered or produced at trial. The prosecution conceded this point, and the trial court found this factor satisfied. In terms of the fourth *Cress* factor, the trial court held the evidence regarding Mitchell would not make a different result more probable on retrial. The trial court stated, "a closer examination shows that, if anything, [Mitchell's] affidavit makes Edward [sic] Wright an accomplice during the events or possibly an accessory after the fact." Further:

> Mitchell relays statements allegedly made by Wright that Wright "had to get rid of Holmes" to get his money. Wright also asked Mitchell to help him get rid of two pistols. The most this evidence can be used for is to impeach Wright's testimony and make Wright look like an accomplice to a homicide in front of a reasonable jury in light of the other evidence that implicates defendant and which caused him to be convicted of murder at the end of the first trial. During the trial, the jury heard testimony that Wright and maybe others were involved in the cleanup and cover up

-5-

of Holmes's murder. Wright readily admitted to knowing Holmes carried and had access to large sums of cash. He testified Holmes was a loan shark, whom he had previously borrowed money from in the past. He further testified to being aware that the [sic] Holmes carried a .357 handgun on him at all times. He further testified to helping clean the crime scene and that he was to receive money from the defendant at a later time to keep his mouth shut. Defendant's closing arguments revolved around Wright having the motive and opportunity to kill Holmes. Further, the defendant identified the inconsistencies in the multiple statements Wright gave to the police and testified to [sic] at trial. The jury, having ample opportunity to consider these facts, chose to find the defendant guilty.

The trial court added that, "[i]n the end, Mitchell was not an eye witness who could shed light on what happened at the time of the murder, but rather someone who would add another accomplice to the homicide."

The trial court also found that Mitchell's statement:

does not address the testimony of Lisa Shepherd [sic] who placed the defendant at the scene at the time of the homicide. It also leaves unanswered the defendant's whereabouts for a period of six years, while the witness, Wright, immediately made himself available to the police. The affidavit of Mr. Mitchell alone, considering all the additional evidence produced at the trial, would not make a different result more probable on retrial.

Similarly, according to the trial court, Wright's identification card did not satisfy this prong, and the note stating Wright was a suspect at most implicated Wright in the murder but did not exonerate defendant. Lastly, the trial court found evidence of Wright missing his polygraph appointments did not necessarily lead to the conclusion Wright was avoiding the police and would not make a different result more probable at retrial.

In terms of defendant's *Brady* argument, the trial court noted that this Court remanded the matter for it to address the *Cress* factors, without specific instructions to address defendant's due-process argument. The trial court indicated "none of the purported 'new evidence' bears any exculpatory value to the defendant; at most, it inculpates Edmond Wright in John Holmes's murder." As a result, the trial court determined "none of the new evidence purported by the defendant's motion leaves the court with the impression that the proceeding would have been different if it were introduced at the defendant's trial for the sole reason of further impeaching Edmond Wright." The court additionally opined:

The new evidence purported by the defendant does not exculpate the defendant whatsoever; it merely implicates Wright, whose involvement in John Holmes's murder was always an issue before the jury. However, at trial, the jury elected to convict the defendant despite the defense that Wright was the real perpetrator, as fully explored above. As such, defendant has failed to demonstrate that the new evidence is favorable to him (either as exculpatory or impeaching) or material under *Brady*.

The trial court concluded the evidence in the miscellaneous file was unlikely to make a different result more probable on retrial and denied defendant's motion. This appeal followed.[6]

## II. NEWLY DISCOVERED EVIDENCE

Defendant argues the trial court abused its discretion when it denied his motion for relief from judgment. We agree in part, as we conclude that an evidentiary hearing is required where defendant can present the testimony of Jason Mitchell, because the contents of Mitchell's affidavit, if determined to be credible after a hearing, could create a reasonable probability of a different outcome on retrial. This holds true because, *if* Mitchell testifies at the evidentiary hearing, and *if* he credibly testifies consistent with his affidavit, that testimony may provide defendant with the ability to establish that Wright committed the murder, or would allow defendant to more substantially attack Wright's credibility, and perhaps cause reasonable doubt as to his guilt.

### A. STANDARD OF REVIEW

This Court reviews "a trial court's decision on a motion for relief from judgment for an abuse of discretion and its findings of facts supporting its decision for clear error." *People v Swain*, 288 Mich App 609, 628; 794 NW2d 92 (2010). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes, or makes an error of law." *Id.* at 628-629 (citations omitted). "The interpretation of a court rule is a question of law that is reviewed de novo." *Id.* at 629.

### B. ANALYSIS

Defendants may move for relief from judgment of their conviction and sentence. MCR 6.502(A). A defendant is generally only entitled to file one motion for relief from judgment. MCR 6.502(G)(1); *Swain*, 288 Mich App at 631. However, MCR 6.502(G)(2) provides exceptions to this bar against successive motions:

> (2) A defendant may file a second or subsequent motion based on any of the following:
>
> > (a) a retroactive change in law that occurred after the first motion for relief from judgment was filed,
> >
> > (b) a claim of new evidence that was not discovered before the first such motion was filed, or
> >
> > (c) a final court order vacating one or more of the defendant's convictions either described in the judgment from which the defendant is seeking relief or upon which the judgment was based.

---

[6] *People v Ray*, unpublished order of the Court of Appeals, entered August 21, 2023 (Docket No. 365913).

A defendant may not file a successive motion without raising one of these exceptions. MCR 6.502(G)(1).

We had previously held that defendant's successive motion for relief from judgment survived the threshold hurdle of MCR 6.502(G)(2), because it presented a claim of new evidence not discovered before the first motion was filed. *People v Ray*, unpublished order of the Court of Appeals, entered July 23, 2020 (Docket No. 353421). On remand, the issue for the trial court to resolve was whether defendant was entitled to relief under MCR 6.508(D).

Regarding this four-part test, the Supreme Court has stated:

> For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. [*Cress*, 468 Mich at 692 (quotation marks and citation omitted); see also *Johnson*, 502 Mich at 566 (quotation marks and citation omitted).]

Because this Court already determined the evidence was newly discovered and defendant's motion passed the threshold of MCR 6.502(G)(2), the trial court needed to apply the *Cress* framework to determine whether "a new trial [should] be granted on the basis of the newly discovered evidence . . . ." *Cress*, 468 Mich at 692. In doing so, the prosecution and trial court acknowledged that the evidence satisfied the first and third *Cress* factors. The second and fourth factors were disputed, and as noted, were ultimately resolved against defendant. We now turn to an analysis of these disputed factors.

The second *Cress* factor requires the newly discovered evidence to be noncumulative. *Cress*, 468 Mich at 692. In general, cumulative evidence is "[a]dditional evidence that supports a fact established by the existing evidence (esp. that which does not need further support)." *Black's Law Dictionary*, (9th ed), p 636. The trial court found as cumulative the note stating Wright did not return to work after Holmes's murder, and Wright's identification card. But it found the notes referring to Mitchell, and Wright not appearing for a polygraph examination, were not cumulative.

Wright testified at trial and was extensively cross-examined. It was defendant's theory that Wright killed Holmes. But the new evidence suggesting Wright was a suspect, that he failed to appear for polygraph exams, and that Mitchell had contacted police with information about the extent of Wright's involvement in the murder, do not support facts already established by existing evidence. Instead, this evidence introduces new facts. Defendant may have *argued* that Wright committed the murder, but his theory was based only on Wright's inconsistent statements to the police and his opportunity to commit the crime. The jury did not hear evidence that Wright was considered a suspect, that Mitchell had called police with information about the murder, or that Wright missed work after the murder and failed to appear for polygraph exams. Although there was evidence that Wright was repeatedly questioned by police, that did not necessarily suggest that he was a suspect, as opposed to someone who had relevant information. The evidence would have been cumulative if any of the newly discovered items mirrored what was previously admitted

-8-

in support of defendant's theory, but no similar evidence was admitted to establish these points. That evidence was not cumulative, and satisfies the second *Cress* factor.[7]

The fourth factor requires the new evidence to make a different result probable on retrial. See *Cress*, 468 Mich at 692. "In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." *Johnson*, 502 Mich at 566-567. "In other words, a trial court's credibility determination is concerned with whether a *reasonable juror* could find the testimony credible on retrial." *Id.* at 567. The trial court found the police note mentioning Mitchell was credible; however, it noted an evidentiary hearing was unnecessary to determine Mitchell's credibility because the evidence would not make a different result more probable on retrial. It is unclear how the trial court arrived at this conclusion. The new evidence revealed that police referred to Mitchell in a note, and Mitchell later averred that Wright either admitted to killing Holmes, or helped "get rid of" Holmes in order to obtain the money in Holmes's safe. At a minimum, the trial court should have taken testimony from Mitchell to determine the extent of his testimony, and whether he was credible.

"In examining whether this new evidence makes a different result probable on retrial, the trial court must consider the evidence that was previously introduced at trial." *Id.* at 571 (quotation marks and citation omitted). "Thus, the evidence that must be taken into consideration when assessing a claim of newly discovered evidence is not simply the evidence presented at the original trial, but also the evidence that would be presented at a new trial." *Id.* In this matter, "the trial court failed to properly assess the effect of the newly discovered evidence in conjunction with the evidence that was presented at the original trial[]." *Id.* at 572.

The trial court acknowledged that Mitchell's affidavit "may appear to be exculpatory as to defendant." At the same time, the trial court found:

> [t]he most this evidence can be used for is to impeach Wright's testimony and make Wright look like an accomplice to a homicide in front of a reasonable jury in light of the other evidence that implicates defendant and which caused him to be convicted of murder at the end of the first jury trial.

As correctly noted by the trial court, defendant's closing arguments contended that Wright had the motive and opportunity to kill Holmes, and identified inconsistencies in Wright's statements to police. But in rejecting the sufficiency or strength of the affidavit, the court stated that "Mitchell was not an eye witness who could shed light on what happened at the time of the murder, but rather someone who would add another accomplice to the homicide." That certainly may be true, but that is not the only reasonable reading of the affidavit. Instead, a reasonable reading of Mitchell's affidavit could lead to another conclusion: Wright committed the murder.

In order to determine the actual testimony that Mitchell has to offer, the trial court should have held an evidentiary hearing, affording the parties and the court an opportunity to question

---

[7] We agree with the trial court that the note regarding finding Wright's identification card in Holmes's apartment was cumulative to the unrefuted testimony that Wright worked with Holmes and had been in his apartment. The note would merely supplement that existing evidence.

Mitchell to determine the full extent of his testimony and how that clarified testimony would impact the verdict under the fourth *Cress* prong. After all, the relevant question is not only whether the new evidence exonerates defendant, but is also whether Mitchell's statements could have been used to impeach Wright's trial testimony to the extent a different result on retrial would be probable. Without question, Wright's testimony was the most damning evidence against defendant, and Wright's credibility was already under assault given his inconsistent statements to the police and familiarity with Holmes. As the Supreme Court has recognized, "impeachment evidence may be grounds for a new trial if it satisfies the four-part test set forth in *Cress*." *People v Grissom*, 492 Mich 296, 319; 821 NW2d 50 (2012). "Newly discovered impeachment evidence concerning immaterial or collateral matters cannot satisfy *Cress*. But if it has an exculpatory connection to testimony concerning a material matter and a different result is probable, a new trial is warranted." *Id*. at 321. Mitchell's statements, if credibly provided at an evidentiary hearing, could raise doubt regarding Wright's assertions that he was an innocent bystander who happened to arrive at the apartment after the murder and was ordered by defendant at gunpoint to help clean up the mess. Since defendant's conviction was predominantly based on Wright's testimony, raising reasonable doubts about Wright's credibility with Mitchell's statements may have made a different result probable.

Because the extent and credibility of Mitchell's testimony is unclear, and that testimony in consideration with the other noncumulative evidence is crucial to a proper resolution of whether a different result is probable on retrial, we remand the matter to the trial court to hold an evidentiary hearing to take testimony from Mitchell and consider the other admissible, non-cumulative evidence discussed above. After the conclusion of the hearing, the court should re-determine whether the newly discovered evidence satisfied the fourth factor under *Cress*, and if necessary whether the evidence was material under a *Brady* analysis. See *People v Dimambro*, 318 Mich App 204, 219; 897 NW2d 233 (2016) ("To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.") (Quotation marks and citation omitted.)

The trial court's order denying defendant's motion for relief from judgment is vacated, and the matter is remanded for the trial court to hold an evidentiary hearing as described in this opinion, and to issue a decision on defendant's motion based on its findings after the hearing. We retain jurisdiction.

/s/ Christopher M. Murray
/s/ Stephen L. Borrello
/s/ Philip P. Mariani

# Court of Appeals, State of Michigan

# ORDER

PEOPLE OF MI V ROGER CARLOS RAY

Docket No.    365913

LC No.        93-004008-01-FC

Christopher M. Murray
Presiding Judge

Stephen L. Borrello

Philip P. Mariani
Judges

For the reasons stated in the opinion issued with this order, we REMAND this case to the trial court to conduct an evidentiary hearing as outlined in the accompanying opinion. After the remand proceedings conclude, we will review the decisions that the trial court made during those proceedings and consider any remaining issues in this appeal. Any challenges to the trial court's decisions on remand must be raised in this appeal. Therefore, the parties and the trial court must not initiate a new appeal from an order entered on remand within the scope of this appeal. The Clerk of the Court is directed to reject the initiation of a new appeal from such an order.

Defendant must initiate the proceedings on remand within 56 days of the Clerk's certification of this order, and the trial court must prioritize this matter until the proceedings, including the issuance of a decision, are concluded. The proceedings on remand are limited to the issues specified in the opinion accompanying this order.

The parties must serve copies of their filings in the trial court on this Court. Defendant must file with this Court copies of all orders entered on remand within seven days of entry, and must ensure the transcripts of all proceedings on remand are filed in the trial court and this Court within 21 days after completion of the proceedings.

The parties may move for leave to file supplemental briefs after the proceedings on remand conclude.

We retain jurisdiction.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

October 3, 2024
_____
Date

_____
Chief Clerk