*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

V

KENNETH DURELL CLAY,

        Defendant-Appellant.

UNPUBLISHED
May 14, 2026
1:30 PM

No. 361558
Oakland Circuit Court
LC No. 2020-275493-FC

Before: BAZZI, P.J., and BOONSTRA and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of three counts of first-degree murder, MCL 750.316(1)(a), assault with intent to murder (AWIM), MCL 750.83, being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, and five counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of life imprisonment without parole for each count of first-degree murder, 30 to 60 years' imprisonment for the AWIM conviction, and 48 months' to 30 years' imprisonment for the felon-in-possession conviction, and to two years' imprisonment for each count of felony-firearm, to run consecutively to the corresponding felony convictions. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On August 26, 2020, defendant shot Kendrick Lanehart, Dominique Williams, Montray Morris, and Eric Howze. At the time, defendant was living in a townhouse apartment with his girlfriend, Deja McCauley, and their two children. Tashona Robinson had recently moved into the next-door apartment. Robinson was close friends with the victims, and they visited her house daily, hanging out on or near defendant's front porch. Defendant thought that he recognized one of the victims as someone who had seriously injured him in 2015.

On the night of the shooting, McCauley left for the store and saw that there were about 5 to 10 people standing outside defendant's and Robinson's apartments. She thought that the people were "mean mugging" her, meaning that they were looking at her and it was giving her a "weird

vibe." While she was gone, defendant texted her that he did not trust the neighbors. When McCauley returned home, defendant "seemed jittery like he was scared . . . ." Defendant and McCauley went upstairs, and McCauley saw through a window that people had returned to the front porch. McCauley tried unsuccessfully to calm defendant down, but defendant retrieved a gun and went downstairs. McCauley called 911 to report the men sitting on the porch, and she heard "[m]aybe eight or nine" gunshots while she was on the phone. She went downstairs and saw that the front door was open but defendant was not there. Emergency services responded and found that Lanehart, Williams, Morris, and Howze had been shot. Only Howze survived. Investigators discovered that Lanehart had been carrying a firearm in a holster, but the evidence indicated that all the bullets and shell casings recovered from the victims and the crime scene came from defendant's gun.

A few hours after the shooting, defendant turned himself in to the Oakland County Sheriff's Office, where he was interviewed by sheriff's deputies. He explained that he felt threatened because the men were "eyeballing" his house, and that McCauley had seen the men passing around a gun when she left for the store. When he went downstairs, he saw the door being "tampered with," or the handle being "jiggled." He stated that he opened the door and fired at the first person he saw, then went outside and was "just kind of spraying," firing at more than one person. Someone shot back at him after he fired shots.

Defendant was charged with three counts of first-degree murder, AWIM, felon-in-possession, and accompanying counts of felony-firearm. He filed a notice of insanity defense, so the trial court ordered that he undergo a competency examination and a criminal-responsibility examination. In an evaluation with Dr. Judith Block of the Center for Forensic Psychiatry, defendant explained that McCauley had told him that the men on the porch were passing around guns, and that defendant decided to go outside to tell the men to get off his porch. When he went downstairs, he heard the doorknob jiggling, opened the door, and saw a man with a gun pointed at him. He thought that the men were trying to break into his house and hurt him and his family. In an independent psychiatric examination with Dr. Jeffrey Wendt, defendant similarly stated that McCauley had seen a group of men with guns on his porch, that he went to tell them to get off the porch, and that he saw a man turn toward him with a gun when he opened the door. Defendant told Dr. Wendt that he fired the first round at the ground, then ran toward the parking lot. He thought that the men were chasing him, and he heard shots from a man who was aiming his gun at him. Defendant stated that he was sober during the shooting and that he believed that he was acting in self-defense. Both Dr. Block and Dr. Wendt recommended that defendant be found competent and responsible. Defendant withdrew the notice of insanity defense.

At trial, the prosecutor did not present defendant's statements to the police, Dr. Block, or Dr. Wendt during his case-in-chief. Among the witnesses called by the prosecutor was McCauley, who testified that defendant was jittery because he had had a previous altercation (in which he was seriously injured) with one of the people on the porch. And although she testified on direct examination that she did not see a gun, she acknowledged on cross-examination that she had previously testified at the preliminary examination that the people on the porch had a gun. Lanehart was found with a gun, and another witness testified that Morris also had a gun.

When the prosecutor rested, defense counsel asked for a recess to confer with defendant. After the recess, defendant stated under oath that he understood that he had the right to testify and that he was choosing not to testify. The trial court determined that defendant "knowingly, understandably, accurately and unequivocally invoked his right to remain silent and relinquished his right to testify." Defense counsel rested without calling any witnesses. When the parties discussed the final jury instructions, the prosecutor argued that there was insufficient evidence to support an instruction on self-defense. Defense counsel disagreed, explaining that McCauley had testified that she saw a weapon being passed around, that people were sitting on defendant's porch, that defendant had previously been assaulted by some of those people, and that Lanehart was carrying a gun. The trial court determined that there was sufficient evidence to support an instruction on common-law self-defense.[1] Despite the instruction, the jury found defendant guilty on all counts, and the trial court sentenced defendant as described.

Defendant then moved for a new trial and an evidentiary hearing, arguing that he was denied the effective assistance of counsel because defense counsel failed to call any witnesses and advised him not to testify. According to defendant, his testimony was necessary to establish a self-defense theory, so his counsel's advice not to testify left him with practically no chance of acquittal. During a *Ginther*[2] hearing, defendant testified that he was under the influence of ecstasy on the night of the shooting, that he personally saw the people on the porch passing around a gun, and that he saw the doorknob jiggle, opened the front door, then saw a man turn toward him and lift up a gun. Defendant also testified that he heard gunshots aside from his own, which he believed were fired by someone in the nearby parking lot. He stated that he was "under distress" and under the influence of drugs during his police interview, which caused him to feel sleepy. Defendant claimed that he told his story to defense counsel, including that he saw the doorknob jiggle, and that he would have testified if defense counsel had not advised against it.

Defense counsel, on the other hand, testified that defendant told him a much different story. According to defense counsel, defendant told him that the men on the porch were the ones who opened the front door and that they were entering defendant's home when defendant fired his gun. Defendant never told defense counsel that he saw people passing around guns or lifting a gun toward him. Defense counsel explained to defendant that the prosecutor would likely impeach defendant's testimony with his prior inconsistent statements to the police and doctors. He recommended that defendant not testify to provide the jury with a cleaner record, avoid credibility issues, and prevent the prosecutor from establishing defendant's motive as revenge for being assaulted in the past.

---

[1] Defendant concedes that statutory self-defense was not an available defense in this case because he was engaged in a crime (felon-in-possession) at the time that he used deadly force. See MCL 780.972(1). He relies only on the common-law doctrine of self-defense. See MCL 780.974 (stating that the Self-Defense Act does not diminish the right to use deadly force under common law).

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

The trial court found that defense counsel's testimony about the story defendant had told him was credible because "[h]e was knowledgeable and had no incentive to mislead the Court or otherwise lie." By contrast, it "afforded no weight or credibility" to defendant's testimony because defendant had an extensive criminal record, "including fraudulent use of a credit card and obstruction of justice." Furthermore, "[h]is statements were contradicted by prior statements, physical evidence, and eyewitness testimony." It determined that defendant did not tell his counsel that the doorknob jiggled, that a gun was in the victim's hands, or that he heard gunshots other than his own. The trial court concluded that defense counsel gave competent advice not to testify and that there was no reasonable probability that defendant's testimony would have changed the outcome of his trial. It held that defendant was not denied the effective assistance of counsel. This appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that defense counsel was ineffective because he advised defendant not to testify at trial, thereby eliminating any chance that the jury would believe that he acted in self-defense. We disagree.

### A. STANDARD OF REVIEW

"A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law. All findings of fact are reviewed for clear error, while the legal questions are reviewed de novo." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021) (quotation marks and citations omitted). Clear error exists "[w]hen the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Id.* (quotation marks and citation omitted). We must also consider the "special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). De novo review means that we must "review the issues independently, with no required deference to the trial court." *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019).

### B. ANALYSIS

A criminal defendant has a right to a fair trial, which includes the effective assistance of counsel. *Isrow*, 339 Mich App at 531, citing US Const, Am VI, and Const 1963, art 1, § 17. "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016), citing *Strickland v Washington*, 466 US 668, 687-688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

"Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012) (quotation marks and citation omitted). "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Petri*, 279 Mich App 407, 411; 760 NW2d 882 (2008) (quotation marks and citation omitted). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826

NW2d 136 (2012). This Court has recognized that "decisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy . . . ." *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013). This includes "trial counsel's advice to defendant not to testify on his own behalf." *People v Tommolino*, 187 Mich App 14, 17; 466 NW2d 315 (1991). "If this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness." *People v Haynes*, 338 Mich App 392, 429-430; 980 NW2d 66 (2021). But the trial strategy "in fact must be sound, and counsel's decisions as to it objectively reasonable; a court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014) (quotation marks and citation omitted).

## 1. PERFORMANCE

Defendant was not denied the effective assistance of counsel because he has not overcome the presumption that defense counsel's decision to advise him against testifying was a matter of sound trial strategy.

As a preliminary matter, defendant argues that the trial court clearly erred when it found defense counsel's testimony to be credible because defense counsel's version of events was the only version in which the victims entered defendant's front door and because defense counsel had a motive to lie to avoid legal sanctions for improper legal representation. On the other hand, the prosecutor argues that defendant had a motive to lie to get "another bite at the apple," explaining that defendant progressively took less responsibility for his conduct over time and that his changing statements undermined his credibility.

We see no basis to conclude that the trial court clearly erred when finding defense counsel more credible than defendant. The trial court was able to directly observe and hear the testimony, so we must defer to its credibility determinations absent extreme or unusual circumstances. See *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018). No such circumstances are present in this case. A counsel's incentive to avoid the professional consequences of a successful ineffective assistance claim and a defendant's incentive to get another chance at acquittal are potential motives to lie in any ineffective-assistance case. But there were significant discrepancies between defendant's statements to the police and to doctors, and between those statements and defendant's testimony at the *Ginther* hearing. For example, he told the police that he opened the door and fired at the first person he saw, then went outside and was "just kind of spraying," firing at more than one person. But he told Dr. Block that he opened the door and saw a man with a gun pointed at him. And he told Dr. Wendt that he opened the door and saw a man turn toward him with a gun, that he then fired the first round at the ground and ran toward the parking lot while hearing shots from a man who was aiming his gun at him. He also told Dr. Wendt that he was sober, yet he acknowledged at the *Ginther* hearing that he was under the influence of ecstasy. And although he had told the police and the mental-health professionals that McCauley had seen the men passing around a gun, he testified at the *Ginther* hearing that he had personally seen this. Defendant's testimony that he heard gunshots and saw a victim with a gun were also unsupported by the physical evidence because Lanehart's gun was found in its holster and the only bullets and shell casings at the scene matched defendant's gun. Given the evidence and the deference owed to the trial court's credibility determinations, we are not left with a definite and firm conviction that the trial court made a mistake when assessing the credibility of the witnesses at the *Ginther*

-5-

hearing and determining which version of events he had shared with defense counsel. See *Isrow*, 339 Mich App at 531.

But even if defendant had told defense counsel the same version of events that he testified about in the *Ginther* hearing, defense counsel's decision to advise him not to testify was not unreasonable. A successful self-defense theory requires the following evidence:

> At common law, the affirmative defense of self-defense justifies otherwise punishable criminal conduct, usually the killing of another person, if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." [*People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010) (quotation marks and citation omitted).]

"[A] defendant may show his state of mind by circumstantial evidence to establish that he acted in self-defense," and he "need not take the stand and testify." *People v Hoskins*, 403 Mich 95, 100; 267 NW2d 417 (1978).

Some evidence presented at trial supported defendant's theory of self-defense. McCauley testified that defendant recognized one of the people who was sitting on the porch as someone who had assaulted defendant five years earlier. She testified that defendant was feeling paranoid and scared because of the men on the front porch. An eyewitness testified that both Lanehart and Morris had weapons on them (although no weapon was recovered from Morris). McCauley initially told the jury that she never saw the men outside defendant's apartment possessing a gun, but defense counsel elicited testimony on cross-examination in which she admitted that she had testified at the preliminary examination that she saw people with a gun before the shooting.

To be sure, defendant's testimony could have strengthened the self-defense argument. If defendant testified as to a version of events that matched defense counsel's description of his story, then it would have supported a finding that the men who were on the porch opened the door to defendant's house and threatened him, which could constitute imminent danger or a threat of serious bodily harm. If defendant testified as to the version of events that he himself asserted during the *Ginther* hearing, then it would have supported a finding that one of the men jiggled the doorknob and pointed a gun at him when he opened the door, which would have similar legal implications.

However, there were risks associated with defendant's testimony. If defendant testified, then the prosecutor could impeach his testimony with the statements that defendant had made to the police and to the mental-health professionals who assessed his competence to stand trial. Defendant stated in his interview with the police that after hearing people at his front door, he "just open[ed] the door" and "fire[d] at the first guy" that he saw, without specifying that anyone was holding a gun. He also stated in his evaluation with Dr. Wendt that he fired the first round at the ground, not at any person. There were also inconsistencies across defendant's statements regarding whether he was sober or under the influence of ecstasy or other substances at the time of the shooting. Given that the belief of imminent danger must be *reasonable*, inviting a debate over defendant's sobriety could actually undermine his defense. After seeing that the prosecutor

had decided not to introduce defendant's statements to the police or the doctors, defense counsel reasonably concluded that defendant's testimony carried more risk than potential benefit.

Defendant argues that his only defense was self-defense, specifically that "it was beyond reasonable dispute at trial that [defendant] would be guilty of the charged offenses but for some legal justification." According to defendant, there was evidence at trial that defendant was afraid, but there was no evidence that defendant reasonably believed that his life was in danger, that there was any imminent threat of harm to defendant or that a threat created a necessity for defendant to use deadly force to prevent any harm to himself. See *Dupree*, 486 Mich at 707. But defendant's case was not utterly doomed—after hearing all of the evidence, the trial court found it sufficient to support an instruction on self-defense. And during his closing argument, defense counsel argued not just self-defense, but also that there was reasonable doubt that defendant was guilty of all the crimes because the investigators only recovered three shell casings, even though four people were injured and McCauley testified that she heard eight or nine gunshots.

Defense counsel was not ineffective just because the jury was not convinced by his arguments. See *People v Hieu Van Hoang*, 328 Mich App 45, 64; 935 NW2d 396 (2019) ("Matters of strategy that were not successful, in hindsight, do not constitute deficient performance."). Defendant has not overcome the presumption that his counsel's advice was objectively reasonable. See *Trakhtenberg*, 493 Mich at 52. See also *Tommolino*, 187 Mich App at 17 ("Concerning trial counsel's advice to defendant not to testify on his own behalf, while this strategy is somewhat questionable in light of trial counsel's failure to present *any* defense, we must agree with the trial court that defendant had not overcome the presumption that the challenge action might be considered sound trial strategy.") (emphasis added). Therefore, defendant's ineffective-assistance claim fails under the first prong of the *Strickland* test. See *Shaw*, 315 Mich App at 672.

## 2. PREJUDICE

Although we may affirm on the basis of the first prong alone, we also note that defendant's argument fails the second prong of the *Strickland* test because he was not prejudiced by defense counsel's decision to advise him not to testify. See *id*.

"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. "[W]here there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt." *Trakhtenberg*, 493 Mich at 56 (quotation marks and citation omitted).

In this case, there was significant evidence to support a guilty verdict on all counts. The physical evidence showed that the shell casings and bullets recovered from the victims and the crime scene matched defendant's gun. The only other gun recovered was found in Lanehart's holster on his body, indicating that Lanehart never drew the weapon. An eyewitness who was with Lanehart during the shooting testified that Lanehart and Morris were both carrying a concealed firearm, but they never passed them around or drew the weapons. She testified that the front door suddenly swung open in the middle of their conversation, someone shouted an insult, and then she

heard gunshots and a spark from a weapon just before Lanehart dropped to the ground. Given that this eyewitness was present just a few feet from the front door and had no reason to lie to protect defendant, a jury could find her more credible than defendant's girlfriend, who was upstairs during the shooting. Defendant's testimony at the *Ginther* hearing that someone pointed a gun at him and either jiggled the doorknob or entered his home was not corroborated by any other evidence. It likely would not have convinced a jury that he acted in self-defense, especially after the prosecutor impeached the testimony as previously described.

At best, defendant's testimony would not have had much effect on his self-defense theory, and at worst, it would have undermined the defense. Defense counsel's decision to advise defendant not to testify in this situation reflected reasonable trial strategy. Accordingly, defendant was not denied the effective assistance of counsel.

Affirmed.

/s/ Mariam S. Bazzi
/s/ Mark T. Boonstra
/s/ Brock A. Swartzle